# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PRIYA VERMA, on behalf of           :
herself and all others similarly    :
situated,                           :
        Plaintiff,           :           CIVIL ACTION
                             :           No. 13-3034
        v.                   :
                             :
3001 CASTOR, INC., d/b/a            :
THE PENTHOUSE CLUB                  :
and/or THE PENTHOUSE               :
CLUB @ PHILLY, et al.,             :
        Defendants.          :

**June _30, 2014**                                          **Anita B. Brody, J.**

## MEMORANDUM

Plaintiff Priya Verma ("Verma"), on behalf of herself and all others similarly situated, brings this collective action/class action lawsuit against Defendants 3001 Castor, Inc. d/b/a The Penthouse Club and/or The Penthouse Club @ Philly ("Defendant"), ABDCE Pennsylvania Management, LLC and Doe Defendants 1-10 seeking to recover for Defendant's violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Pennsylvania Minimum Wage Act ("MWA"), 43 P.S. § 333.101 *et seq.*, the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. § 260.1 *et seq.*, and Pennsylvania common law.  Verma, a former exotic dancer at Defendant's adult nightclub, claims that Defendant improperly classified its dancers as independent contractors instead of employees, and as a result, Verma and other potential class members were deprived of the mandated minimum wage for all hours worked and premium overtime compensation for all hours worked in excess of 40 hours a week.  She also claims that dancers were forced to improperly share a percentage of their gratuities with Defendant and forced to reimburse Defendant for ordinary business expenses.  Verma claims that (i) all dancers

are entitled to be paid mandated minimum wages for all hours worked; (ii) all dancers are entitled to premium overtime compensation for all hours worked in excess of 40 hours a week; and (iii) all gratuities earned by dancers are the property of the dancers.

Presently before me are four motions: the Defendant's Motion for Summary Judgment; Verma's Motion to Strike the Affidavit of Joan Lenahan and Supporting Appendices;[1] Verma's Motion for FLSA Conditional Class Certification; and Verma's Motion for Rule 23 Class Certification. On June 24, 2014, I held an oral argument on the pending motions, and I now decide the motions as follows.

## I.    FACTUAL BACKGROUND[2]

The relevant facts of this case are undisputed. Defendant operates an adult nightclub located at 3001 Castor Avenue, Philadelphia, Pennsylvania under the names of "The Penthouse Club," "Penthouse Club @ Philly" and "The Penthouse Club Philadelphia." Answer ¶ 15. In reference to the pornographic magazine *Penthouse*, the club's slogan is "Where the Magazine Comes to Life." Lenahan Dep. at 90:1-2. The nightclub provides adult entertainment, specifically topless female dancers. Silva Dep. at 64:4-23. Dancers entertain Defendant's customers by performing seductive dances. *Id*. at 65:8-21. Plaintiff Verma was employed by Defendant as a dancer from August 2009 through October 2009, and then again from August 2012 through May 2013. Verma Dep. at 14:1-24. Although many dancers do not work full time

---

[1] Verma moves to strike the affidavit of Joan Lenahan and the supporting appendices on the ground that they constitute an impermissible submission of expert testimony that was not previously disclosed in accordance with Federal Rule of Civil Procedure 26(a)(2). While I acknowledge several facts from the affidavit in the Factual Background section, Defendant has failed to demonstrate the relevance of the opinion testimony in the Lenahan affidavit, and I will not consider this testimony for the purposes of deciding the motion for summary judgment. Therefore, I will deny the motion to strike as moot.

[2] This Factual Background is based on the evidence submitted by the parties in the briefing of the Defendant's Motion for Summary Judgment and taken "in the light most favorable to the non-moving party" as required on summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Verma submitted some of this same evidence in support of her motions for FLSA conditional class certification and Rule 23 class certification. In addressing those motions, I will rely only on the evidence provided in briefing those motions and I will specify the source of the evidence on which I am relying.

at Defendant's club, *see* Lenahan Aff. ¶¶ 12, 14, at times, Verma worked in excess of forty hours per week at the club.  Verma Dep. at 76:12-24.

Defendant classifies all dancers as independent contractors.  Lenahan Dep. at 81:17-82:11; Silva Dep. at 49:9-12.  Defendant does not pay its dancers; any compensation that dancers receive comes from customers of the nightclub.  Lenahan Dep. at 201:8-202:18.  Dancers are paid by customers for stage performances and private dances.  *Id.* at 201:10-24.  Defendant mandates a uniform price of $30 for a four-minute private dance in a private room; dancers are not permitted to charge more than the $30 set price and are not permitted to perform private dances on the main floor.  Silva Dep. at 84:1-24, 101:8-13, 113:22-114:8.  Defendant similarly sets the price for a half-hour or one-hour private dance in a skybox room at $300 and $500, respectively; dancers are not allowed to charge more.  *Id.* at 108:6-109:25.  Defendant's podium host tracks the number of private dances that a dancer performs during a shift, and initially collects the cash payments from customers.  *Id.* at 86:6-87:23, 108:14-17.[3]  The club keeps a room rental fee of $10 for each four-minute dance, $125 for each half-hour dance, and $200 for each one-hour dance.  *Id.* at 84:6-8, 108:23-109:7.  At the end of a dance, the podium host divides the cash received from the customer between the dancer and the club.  Verma Dep. 26:14-18.  Dancers decide for whom to dance and how to use their shift time, providing the potential to earn as much as $1600 per shift if they are able to continuously book dances.  Lenahan Aff. ¶ 12.  However, if a dancer does not perform any private dances and does not receive any payment from customers while performing on stage, a dancer receives no compensation for her time spent at the club.  Lenahan Dep. at 202:13-18.

---

[3] These records are the only records maintained regarding the number of private dances that each dancer performs. These records are destroyed every night and have been destroyed every night since the filing of this lawsuit.  *Id.* at 116:12-23.

Defendant decides whether a dancer may perform at the club.  Silva Dep. at 136:6-9; *Id*. at 185:11-22.  During an audition, a club manager evaluates a prospective dancer on her appearance and whether she is a "fluid" dancer.  *Id*. at 157:15-24.  The manager also evaluates a prospective dancer's "social skills, hygiene, [and] actions" including whether the individual can "hold a conversation."  *Id*. at 156:19-157:2.  Defendant executes agreements with all dancers stating that the dancers are independent contractors and that their relationship with the club can be terminated at any time without notice and without cause by either party.  Lenahan Dep. at 81:8-82:1.  Dancers are under nearly continuous review by club management.  Silva Dep. at 265:15-19, 184:15-185:25.  At the same time, dancers may move from Defendant's nightclub to another nightclub as they please.  Silva Aff. ¶ 6.

Prior to their first performance at Defendant's club, Defendant provides instruction to dancers regarding their physical appearance.  Silva Dep. at 173:4-16.  Defendant installed a salon on its premises and has directed dancers to go to the salon to have certain work done.  *Id*. at 244:9-15.  In some cases, Defendant paid for those services.  *Id*. at 244:16-20.  Defendant also dictates dancers' choice of dress and hairstyle.  Verma Dep. 28:16-23, 29:18-30:12.  For example, dancers have been threatened with fines for failing to wear their hair down.  Silva Dep. at 229: 21-25; Verma Dep. at 66:1-22, 67:2-12.

In addition to rules regarding appearance, Defendant imposes other scheduling policies, fee structures, and fines applicable to all dancers.  Silva Dep. at 155:7-19, 221:11-20.  Defendant posts in the club and provides to all dancers a document titled "Entertainer Scheduling and House Fees" that outlines these policies and rules.  Silva Aff. Ex. A; Silva Dep. at 136:2-19. With respect to scheduling, the club has five shifts from which a dancer can choose: (i) a "day shift" lasting from 12:00 noon to 6:00 p.m.; (ii) a "mid shift" lasting from 3:00 p.m. to 9:00 p.m.;

(iii) a "preferred shift" lasting from 6:00 p.m. to 12:00 midnight; (iv) a "premium shift" lasting from 8:00 p.m. to 2:00 a.m.; and (v) a "power shift" lasting from 10:00 p.m. to 2:00 a.m.  Silva Aff. ¶ 8.  In general, dancers choose their shifts, their days for those shifts, and their number of shifts per week.  Lenahan Aff. ¶ 12.  Dancers let their "book of business" or followers know via social media when and where they will be appearing.  Silva Aff. ¶ 5.

The club prefers dancers who will rent stage time for at least four days in a given week; dancers who do so are referred to as "Entertainers."  Dancers who do not make the minimum four day commitment are referred to as "Freelancers."  Silva Aff. ¶ 7.  Entertainers are required to provide their shift schedule requests to the "House Moms" by Thursday of each week.  Silva Aff. Ex. A.  In addition, Defendant requires Entertainers to work two Saturdays and/or two Sundays per month.  *Id.*  Entertainers pay no stage rental fee for the day, mid or preferred shifts whereas Freelancers must pay a stage rental fee for all but the day shift.  *Id*. ¶ 8.  Entertainers pay $35 or $85 to work a premium shift or power shift, respectively.  *Id*. ¶ 10.  Freelancers pay $35, $60, $60 or $85 to work a midshift, preferred shift, premium shift, or power shift respectively.  *Id*. ¶ 12.  Failing to appear for a scheduled shift may result in a fine or termination.  Silva Dep. at 181:12-13, 201:17-23.

Defendant's policies also require all dancers, both Entertainers and Freelancers, to be present on Defendant's premises for the entire duration of their scheduled shifts or face additional fees.  Defendant's policy states that dancers must check-in with the podium host and house mom as soon as they arrive for their shifts.  Silva Aff. Ex. A.  Both the so-called podium hosts and house moms keep written records of the time at which dancers enter the club.  Silva Dep. at 122:15-18; 205:1-14.  Defendant assesses a $10 fine for every 30 minutes dancers are late.  Silva Aff. ¶ 14; Silva Dep. at 211:12-22.  When dancers leave Defendant's premises prior

to the end of their scheduled shifts, a fine of $100 may be imposed.  Silva Aff. ¶ 14; Silva Dep. at 197:13-24.  Dancers are free to stay past their shifts without paying the club an additional stage rental fee.  Silva Aff. ¶ 13.

The Defendant's "Entertainer Scheduling and House Fees" document also lists fines that may be enforced for a dancer's failure to comply with Defendant's operational policies and procedures.  Defendant imposes a fine of $25 when a dancer leaves her stage set without waiting for the next dancer to take the stage, is late for the start of her stage set, or fails to inform Defendant that she will not be appearing for a scheduled stage set.  Silva Aff. Ex. A; Silva Dep. at 215:16-20.  Management determines the number of songs a dancer must dance to while on stage.  Silva Dep. at 246:14-24.   If a dancer does not wish to perform on stage, either for a shift or a song, she must pay a "skip fee."  *Id*. at 123:1-5.  Defendant also charges dancers a $25 fine for chewing gum while on stage, failing to use the staircase when accessing or leaving the stage, or talking while on stage.  Silva Aff. Ex. A; Silva Dep. at 220:11-15.  Further, dancers are subject to a $50 fine if they are caught using personal cell phones or other electronic devices while on stage or on the floor, and a $100 fine for smoking on Defendant's premises. Silva Aff. Ex. A; Silva Dep. at 197:11-29, 220:11-221:25.  Dancers must also enter the club exclusively through the dancers' entrance, and dancers are not permitted to change into street clothing before of the ends of their shift.  Silva Dep. at 204:18-25, 256:4-257:2.

Defendant subjects all dancers to mandatory "tip-outs" – a requirement that they tip certain of Defendant's employees.  Defendant requires dancers to pay $15 to the club's disc jockey, $10 the house mom, and $5 to the club's podium host.  Silva Aff. Ex. A.  Dancers are also encouraged to tip the valet attendant.  Silva Dep. at 189:14-25.  In some instances, however, dancers do not make any money or do not make sufficient money to tip the club's disc jockey or

pay the required stage fee.  *Id*. at 189:2-4, 219:11-21.

Defendant controls the club's atmosphere, operations and marketing.  Defendant determines which stages will be open during a given night and the music played at the club.  *Id*. at 249:6-13, 251:4-11, 246:14-24.  Club management is responsible for the maintenance of the facility including the main stage where the dancers perform.  Lenahan Dep. at 122:22-123:4, 171:18-172:12.  In contrast, dancers have very little control over the club's operations.  For instance, dancers do not control whether an admission fee will be charged to the club's patrons.  Lenahan Dep. at 124:15-125:10.  Dancers do not determine the hours the club is open, nor are dancers permitted to perform in the club when it is closed.  *Id*. at 121:6-13.  Dancers are not provided keys to the club.  *Id*. at 121:14-16.  Dancers do not pay any of the licensing fee associated with the use of the Penthouse Club logo.  *Id*. at 89:3-92:14.  Defendant, not the dancers, is responsible for paying for the club's advertising and signage used inside the club.  *Id*. at 74:25-75:10, 78:16-18, 114:25-115:15.  Other than special guest stars (who are not part of the proposed class), Defendant does not advertise any specific dancer in any of its marketing materials.  *Id*. at 123:17-134:5; Silva Dep. at 120:23-121:6.  Dancers have no responsibility for the club's alcohol inventory or food menu.  Lenahan Dep. at 123:5-16.  Defendant purchases alcohol for the club, *id*. at 191:8-9, and Defendant also provides the waitresses, bartenders, door host, security personnel, kitchen personnel, and valets.  Silva Dep. at 49:19-50:12.

## II.     DISCUSSION

### A.  MOTION FOR SUMMARY JUDGMENT

The central issue in this case is whether the dancers at Defendant's nightclub are employees within the meaning of the FLSA and Pennsylvania law.[4]  Defendant moves for summary judgment on the issue, arguing that Verma and other dancers are independent contractors because they control their own time in a way that demonstrates entrepreneurial opportunity for financial gain or loss and because the dancers are in business for themselves rather than being dependent on Defendant's business for the opportunity to render service. Defendant argues that because Verma and the proposed class are independent contractors, they have no cause of action under the FLSA or MWA.  Verma argues that under the multi-factor economic reality test, the dancers are employees with valid claims under the FLSA and Pennsylvania law.

### 1.  Legal Standard

Summary judgment is appropriate under Rule 56 when the pleadings and evidence demonstrate that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the

---

[4] The Pennsylvania courts have adopted the federal courts' "economic reality" test for determining whether an individual is an independent contractor or employee for the purpose of the MWA.  *Com., Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber*, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003) (holding that the "economic reality" test employed by federal courts was appropriate standard to use to determine whether plaintiff was an employee or independent contractor for purposes of the MWA); *Bayada Nurses, Inc. v. Com., Dep't of Labor & Indus.*, 958 A.2d 1050, 1058 (Pa. Commw. Ct. 2008) ("[I]n *Stuber* the Court noted the virtually identical definitions for "employ, employer and employee" in the MWA and the FLSA and that because of this identity of purpose the Court adopted the federal economic reality test used by federal courts as the standard for determining if an individual is an employee under the MWA or an independent contractor.").  Thus, I will analyze Verma's status as an employee or independent contractor only under federal law.

burden of establishing both the absence of a genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Anderson*, 477 U.S. at 247; *Celotex*, 477 U.S. at 322. A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However if it finds that there are no material issues of fact remaining for trial, the Court, after giving notice and reasonable time to respond, may enter summary judgment for the non-moving party. Fed. R. Civ. P. 56(f)(1); *see Nat'l Expositions, Inc. v. Crowley Mar. Corp.*, 824 F.2d 131, 133 (1st Cir. 1987) ("[A] district court has the legal power to render summary judgment . . . in favor of the party opposing a summary judgment motion even though he has made no formal cross-motion under rule 56.") (internal quotation marks omitted) (citing 10A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 2720 (3d ed. 1998)).

## 2. The FLSA's Economic Realities Test

In the Third Circuit, courts determining whether a worker is an employee or an independent contractor for purposes of the FLSA look to the economic realities of the relationship between the alleged employer and employee. *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382-83 (3d Cir. 1985). Congress and the courts have both recognized that, of all the acts of social legislation, the FLSA has the broadest definition of "employee." *Id*. at 1382. In ascertaining the economic realities of the relationship, the following factors should be considered:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4)

> whether the service rendered requires a special skill; 5) the degree of permanence
> of the working relationship; [and] 6) whether the service rendered is an integral
> part of the alleged employer's business.

*Id.* (citing *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981)). "Neither the

presence nor absence of any particular factor is dispositive and [ ] courts should examine the

'circumstances of the whole activity,' and should consider whether, as a matter of economic

reality, the individuals 'are dependent upon the business to which they render service." *Id.* at

1382 (citing *Sureway*, 656 F.2d at 1370). "The determination of 'employee' status under the

FLSA is a question of law, although it depends on subsidiary factual determinations. Employee

status can be determined by the district court on a motion for summary judgment where there are

no genuine disputes of material fact." *Thompson v. Linda And A., Inc.*, 779 F.Supp.2d 139, 147

(D.D.C. 2011) (citation omitted).[5]

### a. Alleged Employers' Degree of Control over Performance of the Work

Verma argues that Defendant exercises a significant amount of control over its dancers.

Defendant's "Entertainer Scheduling and House Fees" document establishes policies and rules

on shift timing, scheduling, mandatory tip-outs and enforced fines. Silva Aff. Ex. A; Silva Dep.

at 280:21-25. The Defendant establishes five specific shift times during which dancers can

choose to work. Silva Aff. ¶ 8. Defendant requires dancers who want to be classified as

Entertainers, thus avoiding additional employment fees, to work at least four day per week and

---

[5] Before embarking on an examination of how the factors identified in the economic realities test apply to the undisputed facts here, I note that faced with similar factual records, "nearly without exception, [ ] courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F.Supp.2d 901, 912-13 (S.D.N.Y. 2013) (citing *Harrell v. Diamond A Entm't, Inc.*, 992 F.Supp. 1343, 1348 (M.D. Fla. 1997)) (*see Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 329 (5th Cir. 1993); *Stevenson v. Great Am. Dream, Inc.*, No. 12-3359, 2013 WL 6880921 at *4-6 (N.D. Ga. Dec. 31, 2013); *Thornton v. Crazy Horse, Inc.*, No. 06-0251, 2012 WL 2175753, at *15 (D. Alaska June 14, 2012); *Clincy v. Galardi S. Enters., Inc.*, 808 F.Supp.2d 1326, 1343 (N.D. Ga. 2011); *Thompson*, 779 F.Supp.2d at 151; *Morse v. Mer Corp.*, No. 08-1389, 2010 WL 2346334, at *6 (S.D. Ind. 2010); *Reich v. Priba Corp.*, 890 F.Supp. 586, 594 (N.D. Tex. 1995)). *Cf. Matson v. 7455, Inc.*, No. 98-788, 2000 WL 1132110, at *4 (D. Or. Jan. 14, 2000); *Hilborn v. Prime Time Club, Inc.*, No. 11-00197, 2012 WL 9187581, at *1 (E.D. Ark. July 12, 2012).

two Saturdays and/or two Sundays per month.  Silva Aff. Ex. A.  Dancers are required to provide

their preferred shift schedule to the "House Moms" by Thursday of each week.  *Id.* Dancers must

check-in with the podium host and house mom as soon as they arrive for their shifts.  Silva Aff.

Ex. A.  Dancers are not permitted to enter the club through the main entrance; they must enter

through the entertainers' entrance. Silva Dep. at 204:18-25.

Pursuant to the Defendant's schedule of applicable fines, Defendant assesses a $10 fine

for every 30 minutes a dancer is late.  Silva Aff. ¶ 14; Silva Dep. at 211:12-22.  If a dancer

leaves Defendant's premises prior to the end of her scheduled shift, a fine of $100 may be

imposed.  Silva Aff. ¶ 14; Silva Dep. at 197:13-24.  Defendant imposes a fine of $25 when a

dancer leaves her stage set without waiting for the next dancer to take the stage, is late for the

start of her stage set, or fails to inform Defendant that she will not be appearing for a scheduled

stage set.  Silva Aff. Ex. A; Silva Dep. at 215:16-20.  A $25 fine is also assessed if the dancer

enters the stage from the floor as opposed to the staircase by the DJ booth.  Silva Aff. Ex. A.

Failing to appear for a scheduled shift could cause the dancer to incur a $50 fine or risk

termination.  Silva Dep. at 181:12-13; 201:17-23.

Defendant also provides instruction to dancers regarding their physical appearance and

conduct in the club.  Silva Dep. at 173:4-16.   Defendant dictates dancers' choice of dress, hair,

and make-up.  Verma Dep. 28:16-23, 29:18-30:12.  Dancers cannot wear their hair up.  Silva

Dep. at 229: 21-25.  Management determines the number of songs a dancer must dance to while

on stage.  *Id.* at 246:14-24.  Dancers are not permitted to smoke or chew gum anywhere in the

club, nor are they permitted to use their cell phones while on the dance floor.  *Id.* at 197:11-29,

220:11-221:25.  Dancers are not permitted to change into street clothes before the end of their

shift.  *Id.* at 256:4-257:2.

Defendant sets the price and duration for all private dances, and dancers are not allowed to charge more than the posted prices. Silva Dep. at 84:1-24; 101:8-13; 108:6-109:25. The club does not permit a dancer to give patrons private dances on the main floor. *Id*. at 113:22-114:8. Dancers are under nearly continuous review, and management can determine at any time that they no longer wish to have a dancer perform at the club. *Id*. at 265:15-19; 184:15-185:25.

The presence of club-imposed written and unwritten guidelines for dancers' conduct indicates control and weighs in favor of employee status. *See Clincy,* 808 F.Supp.2d at 1344-45 (finding element of control went in favor of dancers where club provided dancers with a packet of rules covering scheduling, conduct regarding dancing on stage, dress and appearance, and the cost of dances); *Harrell,* 992 F.Supp. at 1349-50 (fact that dancers could control when they danced and for whom was overshadowed by club rules setting prices for table dances, fining dancers for unexcused absences and tardiness, requiring dancers to leave the club as soon as their shift is over; and requiring dancers to perform for all club patrons, not just one or two). Written rules and threats of discipline are tools to control behavior even if they are not acted upon. *See Hart*, 967 F.Supp.2d at 917-18 ("Even though Rick's NY ultimately removed, or credited to the dancer the dollar value of, most of these fines, its written threat to impose such fines, and its imposition of such fines on non-compliant dancers, even if largely retracted, is strong evidence of its control over them."); *Thompson*, 779 F.Supp.2d 139 at 148 (finding that the ability to punish dancers for violations of house rules through fines is indicative of club's control even when violations did not result in fines or fines were uncollected).

The Defendants place significant emphasis on the fact that dancers set their own schedules and decide how to use their shift time. *See* Lenahan Aff. ¶ 12. This was true in several cases where courts found that the dancers were nonetheless employees. *See*, *e.g.*, *Priba*

*Corp.*, 890 F.Supp. at 591; *Harrell*, 992 F.Supp. at 1349 ("The question this Court must resolve is whether a Diamond A dancer's freedom to work when she wants and for whomever she wants reflects economic independence, or whether these freedoms merely mask the economic reality of dependence.").  The real question is whether the dancer exerts control over a "meaningful" part of the business:

> An entertainer at Cabaret Royale is completely dependent on the club for her earnings. The club controls all of the advertising, without which the entertainers could not survive. Moreover, the defendants created and control the atmosphere and surroundings at the Cabaret Royale, the existence of which dictates the flow of customers into the club. An entertainer can be considered an independent contractor only if she "exerts such a control over a meaningful part of the business that she stands as a separate economic entity." In this case, the entertainer's economic status is inextricably linked to those conditions over which defendants have complete control.

*Priba Corp.*, 890 F.Supp. at 592 (citation omitted).  Here, the dancers' control over their schedules is minimal compared to all of the elements of the work that Defendant controlled. Based on the foregoing facts, the factor of control weighs overwhelmingly in favor of a finding that the dancers were employees, not independent contractors.

### b. Alleged Employee's Opportunity for Profit or Loss Depending Upon Managerial Skill

Defendant's primary argument is that a dancer controls her time in a way that shows entrepreneurial opportunity for financial gain or loss indicative of independent contractor status. *See DialAmerica*, 757 F.2d at 1387 (finding that alleged employees were independent contractors under the FLSA where "they faced a real opportunity for either a profit or a loss in their operations, depending upon the amount of their investment and their skills in management"). Defendants argue that a dancer's opportunity to profit is largely a product of her own initiative or "hustle," resulting from when she chooses to work and how she chooses to use her time in the club.  A dancer informs her followers through social media when and where she will be working.

13

Silva Aff. ¶ 5.  Defendant argues that a dancer has an earning potential of $1600 per shift given the 5 hours and 20 minutes available to each dancer to converse with patrons and perform private dances.  Lenahan Aff. ¶ 12.

Verma argues that a dancer's opportunity for profit or loss is controlled by Defendant. Defendant determines the club's hours of operation and decides whether patrons will be charged an admission fee.  Lenahan Dep. at 124:15-125:10.  Defendant determines which stages will be open and what music will be played in the club.  Silva Dep. at 246:14-24, 249:6-13, 251:4-11. Importantly, Defendant sets the length of time and price for all private dances.  *Id.* at 84:1-23, 101:8-13, 108:6-109:25.  Defendant also controls the club's advertising expenditures and food and alcohol inventory.  Lenahan Dep. at 74:25-75:10, 78:16-18, 191:8-9.

"The 'hustling' argument has been universally rejected by every court to consider it." *Harrell*, 992 F.Supp. at 1350 (finding that the appropriate inquiry "has more to do with relative investments, with control over larger aspects of the business, and with like forms of initiative"). As the Fifth Circuit explained in *Reich v. Circle C. Investments, Inc.*, "once customers arrive at [the club], a dancer's initiative, hustle, and costume significantly contribute to the amount of her tips. But [the club's owner] has a significant role in drawing customers to its nightclub[ ] . . . . [The owner] is responsible for advertisement, location, business hours, maintenance of facilities, aesthetics, and inventory of beverages and food." 998 F.2d at 328 (concluding that the dancers "are far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments") (internal quotation marks omitted).  *See also Morse,* 2010 WL 2346334, at *4 ("The Defendant also emphasizes that the Plaintiffs were allowed to advertise and market themselves by using MySpace, Facebook, and simple word of mouth . . . . This may be true, but . . . the Defendant is primarily responsible for drawing

customers into the club.") (citation omitted); *Rick's*, 967 F.Supp.2d at 919-20 ("Rick's NY heavily controlled customer access to the Club; it advertised to attract a clientele that it favored; it set and imposed cover charges; and it set the amounts required for a personal dance or time in a semi-private room. . . . Given Rick NY's control over most critical determinants of the number of customers who visited the Club on any given night or over time, the Club exercised a high degree of control over a dancer's opportunity for profit."); *Priba Corp.,* 890 F.Supp. at 593 ("[E]ntertainers do not control the key determinants of profit and loss of a successful enterprise . . . . the club establishes the hours of operation, sets the atmosphere, and coordinates advertising . . . Any profit to the entertainers is more analogous to earned wages than a return for risk on capital investment.").

Dancers at the Defendant's club risk the loss of the cost of their costume, the stage rental fee, and the mandatory tip-outs in exchange for the opportunity to earn several hundred dollars in a six hour shift.  This is not the kind of capital investment and risk-reward profile typical of someone in business for herself.  Dancers cannot leverage their investment in reoccurring stage fess and tip-outs to create an increasing return on their investment.  As the court in *Harrell* put it:

> Defendant would have us believe that a dancer like Ms. Harrell could hang out her own shingle, pay nothing in overhead,—no advertising, no facilities, no bouncers,—and draw in a constant stream of paying customers.  A dancer at Diamond A risks little more than a daily "tip out" fee, the cost of her costumes, and her time.  That a dancer may increase her earnings by increased "hustling" matters little.  As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns.

*Harrell,* 992 F.Supp. at 1352.  Accordingly, the fact that Defendant controlled a dancer's opportunity for profit and loss militates in favor of finding employee status.

### c.  Relative Investments of the Alleged Employees and Employer

As described above, Defendant has made a significant investment in the nightclub and its operations. Defendant pays for the licensing fee associated with the use of the Penthouse Club logo. Lenahan Dep. at 89:3-92:14. Defendant, not the dancers, is responsible for paying for the club's advertising. *Id*. at 74:25-75:10, 78:16-18. Club management is responsible for the maintenance of the facility including the main stage where the dancers perform. *Id*. at 122:22-123:4, 171:18-172:12. Defendant purchases alcohol for the club, *id*. at 191:8-9, and Defendant also provides the waitresses, bartenders, door host, security personnel, kitchen personnel, and valets for the club. Silva Dep. at 49:19-50:12. The record in this case does not detail the dancers' investment, but in similar cases, many courts have found that dancers invested primarily in hair, make-up, nails, and clothing. *See*, *e.g.*, *Morse,* 2010 WL 2346334, at *5 ("The Plaintiffs 'do not make any capital investment in Defendant's facilities, advertising, maintenance, security, staff, sound system and lights, food, beverage, and other inventory.' . . . The Plaintiffs' only investment is in their costumes and their general appearance (i.e. hair, makeup, and nails.)").

 "The courts which have addressed this factor have universally concluded that a dancer's investment is minor when compared to the club's investment." *Harrell*, 992 F.Supp. at 1350. *See*, *e.g.*, *Circle C. Invs.,* 998 F.2d at 324-28 ("The record does not completely identify Circle C's investment, but it does reveal that Circle C owns the liquor license, owns the inventory of beverages and refreshments, leases fixtures for the nightclub (e.g., the stage and lights), owns sound equipment and music, maintains and renovates the facilities, and advertises extensively . . . . A dancer's investment in costumes and a padlock is relatively minor to the considerable investment Circle C has in operating a nightclub."); *Stevenson*, 2013 WL 6880921, at *5 ("Pin Ups invested far more than the Plaintiffs on necessary personnel and equipment. It provided bartenders, waitresses, cashiers, security staff, and disc jockeys. Pin Ups also provided the

facility, the stages, and the poles.  As other courts have noted, the amount spent on clothing, hair

styling, and make-up is minor when compared to the club's investment."); *Priba Corp.,* 890

F.Supp. at 593 ("Entertainers at the club make no investment in its facilities or atmosphere aside

from choosing what clothing to wear when performing.  All investment and risk capital is

provided by defendants."); *Clincy*, 808 F.Supp.2d at 1346-47 (finding that club's costs of

approximately $900,000 a year on equipment, fixtures, leaseholds, improvement, advertising,

property and liability insurance, rent, set design, maintenance and repair, alcohol, licenses and

music significantly outweighed the spending of the dancers on costumes, shoes, personal

grooming and hair).  As a result, this factor also weighs in favor of employee status.

### d.   Whether the service rendered requires a special skill

In this case, the dancers' primary job responsibilities are to perform topless dances on

stage and provide private dances to the club's customers.  In order to perform at the club, a

prospective dancer must audition for a club manager.  A manager evaluates a prospective dancer

on whether she is a "fluid" dancer and on her appearance.  Silva Dep. at 157:15-24.  The

manager also evaluates a prospective dancer's "social skills, hygiene, [and] actions" including

whether the individual can "hold a conversation."  *Id*. at 156:19-157:2.

Many other courts have previously found that little specialized skill is required to be a

nude dancer.  *See*, *e.g.*, *Circle C. Invs.,* 998 F.2d at 328 (topless dancers "do not exhibit the skill

or initiative indicative of persons in business for themselves"); *Morse,* 2010 WL 2346334, at *5;

*Harrell,* 992 F.Supp. at 1351; *Thompson*, 779 F.Supp.2d at 149; *Priba Corp.,* 890 F.Supp. at

593.  None of the skills evaluated in the Defendant's audition process rise to the level of a

special skill set that would distinguish Defendant's dancers from the multitude of exotic dancers

that courts have held to be employees in analogous actions.  Accordingly, this factor militates in favor of finding an employee relationship.

### e.  Degree of Permanence of the Working Relationship

The record reflects a lack of permanence in the dancers' relationship with Defendant. Under the agreements executed by all dancers with the club, the relationship between a dancer and the club can be terminated at any time without notice and without cause by either party. Lenahan Dep. at 81:8-82:1.  Dancers are under nearly continuous review by management, and at any time, Defendant can ask a dancer to leave the club.  Silva Dep. at 265:15-19, 184:15-185:25. Dancers may also move from Defendant's nightclub to another nightclub as they please.  Silva Aff. ¶ 6.  Verma personally worked for Defendant from August 2009 through October 2009, and then again from August 2012 through May 2013.  Verma Dep. at 14:1-24.

"The more permanent the relationship, the more likely it is that a court will find a worker to be an employee."  *Thompson*, 779 F.Supp.2d at 150.   However, many of the courts that found exotic dancers to be employees under the FLSA did so despite finding that the employment relationship at issue lacked a high degree of permanence.  In *Hart*, the court stated:

> That dancers were free to work at other clubs or in other lines of work, and that they were not permanent employees, does not distinguish them from countless workers in other areas of endeavor who are undeniably employees under the FLSA—for example, waiters, ushers, and bartenders. Other courts have similarly accorded limited weight to this factor, in comparison with the others considered under the FLSA test.

967 F.Supp.2d at 921 (citing *Circle C. Invs.*, 998 F.2d at 328-29 ("The transient nature of the work force is not enough here to remove the dancers from the protections of the FLSA."); *Harrell,* 992 F.Supp. at 1352 ("Other courts have found that exotic dancers tend to be itinerant, but have tended to place less emphasis on this factor. . . . This Court agrees."); *Priba Corp.,* 890

F.Supp. at 593 ("Because dancers tend to be itinerant, the court must focus on the nature of their

dependence"). Thus, this factor weighs in favor of Defendant, but it is not dispositive.

### f.   Whether the Service Rendered is an Integral Part of the Alleged Employer's Business

In the instant action, Defendant markets itself as an "adult gentlemen's club."  Lenahan

Dep. at 83:12-14.  The club's slogan "Where the Magazine Comes to Life" refers to the

pornographic magazine *Penthouse* known for its images of nude women.  *Id.* at 90:1-2.  The club

provides topless female dancers who perform stage dances and private lap dances for customers.

Silva Dep. at 64:20-65:24.  Given that Defendant markets itself on the basis of providing topless

dancers, it cannot credibly argue that the services performed by dancers are not an integral part

of its business.  *See Harrell*, 992 F.Supp. at 1352 ("It obvious that the continued success of

[defendant] depends to an appreciable degree upon" its dancers . . . "That dancers play such an

integral role is highly indicative of their economic dependence."); *Hart*, 967 F.Supp. at 921 ("No

reasonable jury could conclude that exotic dancers were not integral to the success of a club that

marketed itself as a club for exotic dancers.").  This factor weighs in favor of employee status.

### g.   Consideration of All Factors

Considering all the preceding factors in combination, I conclude that as a matter of

economic reality that the dancers at the Defendant's club are employees, not independent

contractors.  Defendant exerts significant control over its dancers' behavior and appearance;

Defendant dominates the key levers driving the dancers' opportunity for profit; the dancers have

no specialized skills and a limited real investment; and the dancers are integral to the success of

the Defendant's club.  Measured against these factors, the transient and non-exclusive nature of

the dancers' employment carries limited weight.  Under the FLSA test, five factors lopsidedly

favor a finding that the dancers are employees. Thus, I will deny Defendant's motion for

summary judgment.

### B.  MOTION TO CONDITIONALLY CERTIFY FLSA COLLECTIVE ACTION

Verma brings her FLSA claims as a collective action to recover unpaid wages and liquidated damages.  Verma alleges that Defendant violated the FLSA by failing to pay her and the proposed class members legally-required minimum and overtime wages.  Verma seeks conditional certification of a class of and the authorization to disseminate notice to the following: "All current and former dancers who worked for 3001 Castor, Inc. d/b/a The Penthouse Club and/or The Penthouse Club @ Philly from May 31, 2010 to the present."  In order to facilitate such notice, Verma seeks production by Defendant of an electronic list of all putative opt-in plaintiffs, including such individuals' most recent contact and identifying information.

#### 1.  Legal Standard

Under the collective action provision of the FLSA, an employee alleging an FLSA violation can bring a suit on behalf of "himself . . . and other employees similarly situated."  29 U.S.C. § 216(b).  To be included in a collective action, plaintiffs must be "similarly situated" and give written consent.  *Id.*

"Courts in [this] Circuit follow a two-step process for deciding whether an action may properly proceed as a collective action under the FLSA."  *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013).  At the first step, the named plaintiff must make a "modest factual showing" that the employees identified in the complaint are "similarly situated."  *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 & n.4 (3d Cir. 2012).  The court conducts a preliminary inquiry into whether the plaintiff's proposed class members were collectively "the victims of a single decision, policy, or plan . . . ."  *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 388 (3d Cir. 2007) (citing *Sperling v. Hoffman-LaRoche, Inc.*, 118 F.R.D. 392, 407 (D.N.J. 1988)).  The

20

plaintiff must produce some evidence "beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Symczyk v. Genesis HealthCare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011), *rev'd on other grounds*, *Symczyk*, 133 S.Ct. 1523 (2013).

The plaintiff has "a very lenient burden to bear at this initial stage of certification." *Lugo v. Farmer's Pride Inc.*, No. 07-0749, 2008 WL 638237, at *3 (E.D. Pa. Mar. 7, 2008); *Smith v. Sovereign Bancorp, Inc.*, No. 03-2420, 2003 WL 22701017, at *3 (E.D. Pa. Nov. 13, 2003) (stressing that "modest factual showing" is an "extremely lenient standard"). "[C]ourts appear to require nothing more than substantial allegations that the putative class members were together victims of a single decision, policy, or plan." *Felix De Asencio v. Tyson Foods, Inc.*, 130 F.Supp.2d 660, 662 (E.D. Pa. 2001). Because of the lenient standard at this stage, some district courts have found the plaintiff's evidence sufficient where declarations and deposition testimony detail common job duties and responsibilities across the named plaintiff and the proposed class. *See In Re: Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, MDL No. 2056, 2010 WL 3447783, at * 21 (W.D. Pa. Aug. 13, 2010); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F.Supp.2d 870, 896-97 (N.D. Iowa 2008). "If the plaintiff meets this lenient standard, the court grants only conditional certification for the purpose of notice and discovery." *Lugo*, 2008 WL 638237, at *3.

At the second stage, with the benefit of discovery, a court must make "a conclusive determination that every plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff." *Symczyk*, 656 F.3d at 193. The plaintiff bears a heavier burden of proof at this second stage and must prove, by a preponderance of the evidence, that the proposed collective plaintiffs are similarly situated. *Zavala*, 691 F.3d at 536. Courts are to take

an ad hoc approach, "consider[ing] all the relevant factors and mak[ing] a factual determination on a case-by-case basis." *Id.* If the conditional plaintiffs are not in fact similarly situated to the named plaintiffs, the group is then decertified, the opt-in plaintiffs are dismissed without prejudice, and any remaining plaintiffs are permitted to move onto the trial stage of litigation. *Lugo*, 2008 WL 638237, at *3.

## 2. Verma and Putative Members of Collective Action are Similarly Situated

Verma has met her fairly lenient burden at the conditional certification stage by making a modest factual showing that Defendant maintains a company-wide policy of treating members of the putative class as independent contractors. In support of her motion for conditional class certification, Verma relies upon the Defendant's Answer, the Defendant's Interrogatory Responses and the Affidavit of Brandon Silva cited above. This evidence presents a modest factual showing that Verma and the other potential plaintiffs: (a) work or worked at the same location; (b) share the same "dancer" job duties and responsibilities; and (c) have been classified as independent contractors. *See* Def.'s Interrog. ¶¶ 3, 4, 5, 13; Silva Aff. ¶¶ 14-18.

Numerous federal courts, including courts in this District, have granted conditional certification and authorized dissemination of judicial notice based on a simple showing that other employees may also have been subjected to the employer's practice of "misclassifying" employees. *See*, *e.g.*, Spellman *v. Am. Eagle Exp., Inc.*, No. 10-1764, 2011 WL 4102301, at *1 n.1 (E.D. Pa. May 18, 2011) (granting conditional certification of collective action where named plaintiffs alleged that defendant violated the FLSA by misclassifying delivery drivers as independent contractors) (citing *Houston v. URS Corp.*, 591 F.Supp.2d 827, 834 (E.D. Va. 2008) (finding sufficient similarity in plaintiffs who were all classified as independent contractors)); *Damassia v. Duane Reade, Inc.*, No. 04-8819, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006)

("[I]t may be appropriate in some cases to find plaintiffs and potential plaintiffs similarly situated based simply on plaintiffs' substantial allegations that they and potential plaintiffs were common victims of a FLSA violation, particularly where defendants have admitted that the actions challenged by plaintiffs reflect a company-wide policy."); *Patton v. Thomson Corp.*, 364 F.Supp.2d 263, 267 (E.D.N.Y. 2005) (concluding that the similarly-situated standard was satisfied where plaintiff alleged that she had worked over forty hours per week without overtime compensation, that her positions was classified improperly as exempt, that other employees in her position had the same job duties, and that the employer had admitted it paid all employees in plaintiff's position in the same manner).

Moreover, federal district courts throughout the country have routinely granted conditional certification and authorized dissemination of judicial notice under facts substantially similar to those present here.  *See Stevenson*, 2013 WL 4217128 (N.D. Ga. Aug. 14, 2013) (granting plaintiff's  motion to conditionally certify a collective action of all entertainers who worked at Pin Ups Nightclub over the past three years); *Jones v. JGC Dallas LLC*, No. 11-2743, 2012 WL 6928101 (N.D. Tex. Nov. 29, 2012) (granting motion to conditionally certify collective action and to authorize notice, and further ordering defendant to provide plaintiff with a list of the names, last known mailing addresses, and email addresses of all exotic dancers who worked at defendant's member clubs during relevant time period), report and recommendation adopted, No. 11-2743, 2013 WL 271665 (N.D. Tex. Jan. 23, 2013); *Ruffin v. Entm't of the E. Panhandle*, No. 11-19, 2012 WL 761659 (N.D. W. Va. Mar. 7, 2012) (granting conditional certification for a class defined as all former exotic dancers who worked for any of the defendants' three exotic dance clubs in West Virginia during the relevant time period and were not paid at an hourly rate

at least equal to the federal minimum wage).  Therefore, I will conditionally certify an opt-in class on the FLSA claims for the purposes of notice and discovery.

### 3.   Class Notice is Appropriate and Plaintiffs' Proposed Notice is Adopted

To enable "similarly situated" potential plaintiffs to opt in, a court has discretion to authorize notice to such individuals.  *See Braunstein v. E. Photographic Labs., Inc.*, 600 F.2d 335, 336 (2d Cir. 1978).  Courts have a duty to oversee the notice process to "ensure that it is timely, accurate, and informative."  *Hoffmann–La Roche v. Sperling*, 493 U.S. 165, 172 (1989).  Likewise, the district court has discretion regarding the form, content, and delivery message of the notice.  *Id*. at 172.

Verma has submitted for approval a proposed notice and opt-in consent form.  In addition to permission to disseminate notice through a mailing, Verma asks that Defendant be ordered to post notice of this suit in a conspicuous place in its nightclub.  I will conditionally grant Verma's request to disseminate and post the notice.

### 4.   Production of Putative Class Member Notice is Necessary to Facilitate Notice

A district court also has the power to direct a defendant to produce the names and contact information of potential plaintiffs.  *See Colozzi v. St. Joseph's Hospital Health Center*, 595 F.Supp.2d 200, 210 (N.D.N.Y. 2009) ("It is certainly not controversial that in a case such as this, where preliminary certification has been granted, defendants should be required to provide names and addresses of potential opt-in plaintiffs; indeed, discovery of such information was specifically authorized by the Supreme Court . . . .") (citing *Hoffmann–La Roche*, 493 U.S. at 169).  As a practical matter, courts often order the production of such information at the notice stage.  *See*, *e.g.*, *Damassia*, 2006 WL 2853971, at *8.

Verma requests that the Court order Defendant to provide a list in electronic format of "all persons employed by Defendant as dancers during the last three years, including their name, job title, address, telephone number, dates of employment, date of birth, and last four digits of their Social Security number." The information requested is essential to identifying and contacting potential opt-in plaintiffs, and I will order Defendant to produce this information.

## III.   MOTION TO CERTIFY RULE 23 CLASS ACTION

Verma also brings this action as a state-wide class action to recover unpaid wages, including inappropriately withheld tips, pursuant to the Pennsylvania Minimum Wage Act of 1968 ("MWA"), the Pennsylvania Wage Payment and Collection Law ("WPCL") and Pennsylvania common law (collectively, "PA State Law"). Verma alleges that Defendant violated PA State Law by, among other things: (i) failing to pay the appropriate minimum wages for all hours worked; (ii) improperly denying overtime wages for all hours worked in excess of forty hours in a work week; and (iii) inappropriately withholding and/or deducting unlawful amounts from the gratuities of the dancers. Specifically, Verma moves for certification of a Rule 23 Class comprised of the following: "All persons who, during the period of May 31, 2010 and continuing through the entry of judgment in this case, performed as a dancer at Defendant's adult entertainment club in Philadelphia, Pennsylvania."

### A.  Legal Standard

To warrant certification, a "class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC,* 687 F.3d 583, 590 (3d Cir. 2012). To meet the requirements of Rule 23(a): "(1) the class must be 'so numerous that joinder of all members is impracticable' (numerosity); (2) there must be 'questions of law or fact common to the class' (commonality); (3) 'the claims or defenses of the representative parties' must be 'typical of the claims or defenses of the class' (typicality); and (4)

the named plaintiffs must 'fairly and adequately protect the interests of the class' (adequacy of representation, or simply adequacy)." *In re Cmty. Bank of N. Va.,* 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)-(4)).  Here, Plaintiffs seek certification under Rule 23(b)(3), "which requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *Cmty. Bank,* 622 F.3d at 291.  Accordingly, the requirements of Rule 23(b)(3) are known as predominance and superiority.

Plaintiffs must affirmatively demonstrate compliance with Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-52 (2011).  Rule 23 is not a pleading standard; each requirement must be "satisf[ied] through evidentiary proof."  *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013).  "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. To certify a class the court must thus find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008) (citation omitted).  In *Behrend*, the Supreme Court "emphasized that it 'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.' " 133 S.Ct. at 1432 (citing *Dukes*, 131 S.Ct. at 2551).

### B.  Discussion

Because I find the predominance requirement dispositive of Verma's motion, I will begin with that analysis and I will not discuss the other requirements for Rule 23 class certification.

### a.   Rule 23(b)(3): Predominance

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *In re: Hydrogen Peroxide Antitrust Litigation,* 552 F.3d at 310 (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997)); *see also* 2 William Rubenstein, Alba Conte & Herbert Newberg, Newberg on Class Actions, § 4:25 (4th ed. 2010) ("[T]he predominance test asks whether a class suit for the unitary adjudication of common issues is economical and efficient in the context of all the issues in the suit.").  Accordingly, a court must examine the elements of a plaintiff's claims "through the prism" of Rule 23.  *In Re: Hydrogen Peroxide Antitrust Litigation,* 552 F.3d at 310.  In order to obtain class certification, a plaintiff "must demonstrate that each essential element of his claim is capable of proof at trial through evidence that is common to the class rather than individual to its members."  *Malack v. BDO Seidman, LLP,* 617 F.3d 743, 746 n. 5 (3d Cir. 2010).  If proof of an essential element of the cause of action requires "individual treatment," then class certification is "unsuitable."  *In Re: Hydrogen Peroxide Antitrust Litigation*, 552 F.3d at 311.

In its recent *Behrend* decision, the Supreme Court confirmed that the same "rigorous analysis" standard that it had applied to the class certification requirements under Rule 23(a) in *Dukes* also applied to the predominance requirement under Rule 23(b)(3).  133 S.Ct. at 1432 (citing *Dukes* and finding that "[t]he same analytical principles govern Rule 23(b).  If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").  As such, performing a rigorous analysis will often require courts to examine the evidence presented in the entire case at the class certification stage to determine whether questions of law or fact – including liability, affirmative defenses, and, critically both here and in *Behrend*, damages – "will inevitably overwhelm questions common to the class."  *Behrend*, 133 S.Ct. at 1433.

In the present case, Verma's briefing and evidence presented in support of her motion for Rule 23 class certification focus on the issue of liability. *See* Pl.'s Class Certification Br. 18 ("The issue of liability is a focal point for consideration of predominance."). She concludes, without any evidence, "Here, once liability is established, the damages computation will involve a mechanical, arithmetical task." *Id*. at 19 n.6. Verma's PA State Law claims, however, present potentially complex damages calculations. Her MWA will require a determination of the hours worked by each dancer; depending on whether the cash received from customers can be counted toward the minimum wage, the damages calculations may also require a determination of the payments each dancer earned from her customers. Verma's WPCL and unjust enrichment claims include allegations that Defendant improperly required dancers to subsidize its business expenses by tipping-out other members of its staff which will add further complexity to the calculations. The record is mixed with respect to existence of documentary evidence that would support damages claims. *See* Silva Dep. at 122:15-18; 205:1-14 (podium hosts and house moms record when dancers enter Defendant's premises); *but see id*. at 86:6-87:23, 108:14-17, 116:12-23 (Defendant's podium host tracks the number of private dances that a dancer performs during a shift but the records are destroyed nightly).

While I do not read *Behrend* "to require, as a prerequisite to certification, that damages attributable to a class wide injury be measurable on a class-wide basis," *Behrend*, 133 S.Ct. at 1436 (Ginsburg & Breyer, JJ., dissenting), the rigorous analysis standard requires additional evidence to demonstrate that damages  calculations will not "inevitably overwhelm questions common to the class." *Id*. at 1433. *See also Butler v. Sears, Roebuck and Co*., 727 F.3d 796 (7th Cir. 2013) (Posner, J.) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement

28

negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").  Thus, I will deny Verma's motion for Rule 23 Class Certification on her PA State Law claims without prejudice to refile the motion after the evidentiary record has been further developed.

## IV.   CONCLUSION

For the preceding reasons, because I find that the dancers are employees, I deny Defendant's motion for summary judgment.  I will deny as moot Verma's motion to strike the Lenahan affidavit and supporting appendices.  I will grant Verma's motion for conditional class certification on the FLSA claims, and I will conditionally order the production of potential plaintiffs' contact information and the dissemination of notice pending a conference with the Court on the content of the proposed notice.  Finally, because I find the current factual record insufficient, I will deny Verma's motion for Rule 23 Class Certification of her PA State Law claims without prejudice to refile the motion at the close of discovery.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies VIA ECF on _____ to:                    Copies MAILED on _____ to: