## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PRIYA VERMA, on behalf of herself and all others similarly situated, | : : : | |
| Plaintiff, | : : | CIVIL ACTION No. 13-3034 |
| v. | : : | |
| 3001 CASTOR, INC., d/b/a THE PENTHOUSE CLUB and/or THE PENTHOUSE CLUB @ PHILLY, et al., | : : : : : : | |
| Defendants. | : | |

**November _29, 2016**                                   **Anita B. Brody, J.**

### <u>MEMORANDUM</u>

Plaintiff Priya Verma, on behalf of herself and all others similarly situated, brings this collective action and class action lawsuit against Defendant 3001 Castor, Inc. d/b/a The Penthouse Club and/or The Penthouse Club @ Philly (collectively, the "Penthouse Club" or the "Club"). Verma alleges that the Penthouse Club violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Pennsylvania Minimum Wage Act ("MWA"), 43 Pa. Cons. Stat. § 333.101 *et seq.*, the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 Pa. Cons. Stat. § 260.1 *et seq.*, and Pennsylvania common law.[1]

The Penthouse Club is an adult nightclub where Verma formerly worked as an exotic dancer. Verma claims that the Penthouse Club improperly classified its dancers as independent contractors instead of employees, and, as a result, the Penthouse Club failed to pay her and all other dancers statutory minimum wages and premium overtime compensation. Verma also

---

[1] I have subject matter jurisdiction over Verma's FLSA claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 201 *et seq.* I have supplemental jurisdiction over Verma's state law claims pursuant to 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative facts.

claims that the Penthouse Club improperly took a percentage of the compensation that dancers earned from performing dances on the Club's stage and in private rooms for individual customers.

On June 30, 2014, I granted Verma's motion for conditional certification of an FLSA collective action class composed of individuals who had worked as dancers at the Penthouse Club from May 31, 2010 to present, pursuant to Section 216(b) of the FLSA.  ECF No. 46.  I also denied the Penthouse Club's motion for summary judgment, and, applying the economic realities test, I ruled that the dancers are employees rather than independent contractors under both the FLSA and Pennsylvania state law.  *See Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 WL 2957453, at *4-*10 (E.D. Pa. June 30, 2014), ECF No. 45.

Verma now moves for final certification of the conditionally certified FLSA collective action, and the Penthouse Club moves for decertification.[2]  In addition, Verma moves for Rule 23 class certification of her claims brought under Pennsylvania law.[3]  On October 11, 2016, I held oral argument on the pending motions.  Additionally, I requested and received supplemental briefing from the parties.

For the reasons explained below, I will grant Verma's motion for final collective action certification, and I will deny the Penthouse Club's motion to decertify the conditionally certified FLSA collective action.  I will grant in part and deny in part Verma's motion for Rule 23 class certification.

---

[2] Verma's Motion for Final Collective Action Certification and the Penthouse Club's Motion to Decertify are effectively cross-motions on the issue of final certification of the FLSA collective action.

[3] On February 5, 2014, Verma moved for class certification of her state law claims under Rule 23 for all dancers who worked at the Penthouse Club from May 31, 2010 to present.  ECF No. 32.  I denied Verma's motion for Rule 23 Class Certification of her state law claims without prejudice to Verma to refile the motion for class certification at the close of discovery.  ECF No. 45.  Verma filed a Renewed Motion for Rule 23 Class Certification on September 1, 2015.  ECF No. 87.  I denied that motion without prejudice to Verma to refile at the same time as she moved for final certification of her FLSA collective action.  ECF No. 102.

## I.     FACTUAL BACKGROUND[4]

The Penthouse Club is an adult nightclub located at 3001 Castor Avenue, Philadelphia,

Pennsylvania.  The Penthouse Club's name references the well-known and similarly-titled

pornographic magazine; the Club has styled itself as the place "where the magazine comes to

life."  First Lenahan Dep. at 90:1-2.  The Penthouse Club employs topless female dancers to

perform for the Club's customers.  Dancers perform in two locations: on the Club's main stage

and in private dance rooms.  Verma worked as one of these dancers from August 2009 through

October 2009, and again from August 2012 through May 2013.

### A.  Private Dance Fees

The Penthouse Club pays dancers no hourly wage, and the Club pays dancers nothing to

perform on stage.  A dancer's compensation depends entirely on her interactions with the Club's

customers.  The only way a dancer can earn money is either to perform dances on the Club's

stage, where patrons may compensate the dancer with tips,[5] or to give a private dance to a

customer in one of the Club's private dance rooms.  When a customer requests a private dance,

he first accompanies the dancer to the podium host and selects the length of his dance.  The

Penthouse Club sets uniform, non-negotiable prices for these private dances: a four-minute dance

costs $30, of which the dancer receives $20 and the Club retains $10; a half-hour dance costs

$300, of which the dancer receives $175 and the Club retains $125; a one-hour dance costs $500,

of which the dancer receives $300 and the Club retains $200.  After the dance, the podium host

---

[4] For additional facts, see my prior opinion of June 30, 2014.  ECF No. 45.

[5] Verma has maintained throughout this litigation that all compensation received by a dancer from customers of the Club should be classified as tips or gratuities.  *See, e.g.,* Pl.'s R. 23 Br. at 24 (categorizing alleged damages as "deductions from tips").  The Penthouse Club has conceded in its supplemental briefing that the money received by a dancer from patrons of the Club during or after a dancer's stage performance is properly classified as a tip or gratuity.  *See* Def.'s Resp. to Pl.'s Supp. Mem. 2, ECF No. 115.

divides the cash received from the customer between the dancer and Club. [6]  The Penthouse Club

designates the amounts retained by the Club as "room rental fees."  The Penthouse Club

contends that a successful dancer can earn up to $1,600 per shift by booking private dances

continuously.  But, if a dancer fails to perform any private dances and receives no money directly

from the Club's customers for her stage dances, she earns nothing for her time spent at the Club.

In fact, because of the additional fees and policies described below, she may incur a loss.

### B.  Stage Rental Fees

To perform at the Penthouse Club, a dancer must rent stage time from the Club for each

shift that she works.  The Penthouse Club classifies each dancer as either an "Entertainer" or a

"Freelancer,"[7] and a dancer's classification dictates the amount she must pay the Club to rent

stage time during her shifts.  Dancers may choose from five different shifts: (1) a "day shift"

lasting from noon to 6:00 p.m.; (2) a "mid shift" lasting from 3:00 p.m. to 9:00 p.m.; (3) a

"preferred shift" lasting from 6:00 p.m. to midnight; (4) a "premium shift" lasting from 8:00 p.m.

to 2:00 a.m.; and (5) a "power shift" lasting from 10:00 p.m. to 2:00 a.m.  Entertainers pay no

stage rental fee for the three earlier shifts and pay $35 to work the premium shift or $85 to work

the power shift.  Freelancers pay no stage rental fee for the day shift, but must pay $35 to work a

mid shift, $60 to work a preferred shift, $60 to work a premium shift, or $85 to work a power

shift.  If a dancer fails to appear for her scheduled shift, the Club may fine her.

### C.  Mandatory Tip-outs

Dancers are also required to "tip-out" certain individuals who work at the Club.  For each

---

[6] The customer initially pays the full amount either to the podium host or directly to the dancer. There is a dispute in the record as to which of these practices has been the Club's standard procedure.  It appears that both arrangements may have been followed at times.  Regardless of whom the customer initially pays, the amount and division of the fee is always the same.

[7] Entertainers must commit to working at least four days per week, including a specified number of weekend shifts each month, and must submit a weekly schedule.  Freelancers may set their own schedule and work as many or as few shifts as they choose.

shift, a dancer must pay $15 to the Club's disc jockey, $10 to the "house mom,"[8] and $5 to the podium host.  The Club also encourages, or in some cases requires, dancers to tip the valet attendant.  These charges, like the stage rental fees, must be paid, regardless of how much money a dancer earns during her shift.

### D.  Fines

The Penthouse Club has a set of rules that the dancers must follow.  Upon arrival, dancers must check in with the podium host and the house mom, both of whom keep records of the time that dancers enter the Club.  The Penthouse Club charges a dancer a $10 fine for every 30 minutes she is late.  Each dancer must stay at the Club for the entire duration of her scheduled shift.  If a dancer leaves the Club before the end of her scheduled shift, the Penthouse Club may charge her a $100 fine.  The Penthouse Club also charges a $25 fine if a dancer is late to the stage or leaves the stage early.  In addition, the Club fines dancers for other rules violations, such as chewing gum on stage ($25), using a cell phone on stage ($50), or smoking in the Club ($100).  The Penthouse Club has intermittently kept records of these fines.

## II.   DISCUSSION

### A.  Final Certification of the FLSA Collective Action

During the opt-in period, twenty-two additional current or former dancers joined the collective action, pursuant to the procedures of section 216 of the FLSA.  Verma now moves for final certification of the collective action class that was conditionally certified on June 30, 2014.  The Penthouse Club moves to decertify the conditionally certified collective action class.

#### 1. Legal Standard

Under the collective action provision of the FLSA, an employee alleging an FLSA

---

[8] The house mom keeps track of the dancers' schedules and assists dancers with "feminine issues."  Compl. ¶ 30, ECF No. 1.

violation can bring a suit on behalf of himself . . . and other employees similarly situated."  29

U.S.C. § 216(b).  To be included in a collective action, the plaintiffs must be "similarly situated"

and give written consent to participate, i.e., opt in.  *Id.*

The Third Circuit has prescribed a two-step process for determining whether plaintiffs are

"similarly situated."  The first step occurs at the conditional certification stage.  The named

plaintiff must make a "modest factual showing," which requires that a plaintiff "produce some

evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the

employer's alleged policy affected her and the manner in which it affected other employees."

*Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 536 n.4 (3d Cir. 2012) (quoting *Symczyk v.

Genesis Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir. 2011), *rev'd on other grounds*, 133 S. Ct.

1523 (2013)).  On June 30, 2014, I found that Verma had made such a showing and granted

conditional certification.  *See Verma*, 2014 WL 2957453, at *12.

The second step occurs at the final certification stage.  "[W]ith the benefit of discovery,

'a court following this approach then makes a conclusive determination as to whether each

plaintiff who has opted in to the collective action is in fact similarly situated to the named

plaintiff.'"  *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d at 243 (quoting *Symczyk*, 656 F.3d

at 193); *see also Zavala*, 691 F.3d at 536 ("It is clear from the statutory text of the FLSA that the

standard to be applied on final certification is whether the proposed collective plaintiffs are

'similarly situated.'").  The plaintiffs bear the burden of making this showing by a preponderance

of the evidence.  *Zavala*, 691 F.3d at 537.  A district court's decision to grant or deny final

certification is not discretionary and must depend only on the court's factual findings as to

whether the plaintiffs are in fact "similarly situated."  *Id*. at 535.  Once this factual finding is

made in the affirmative, the statute mandates that the district court grant final certification.  *Id.*

("We do not believe that the statute gives the district court discretion to deny certification after it has determined that plaintiffs are similarly situated.").

Verma asserts that she is similarly situated to each of the opt-in plaintiffs, and that I should grant final certification. The Penthouse Club does not directly contest this argument. Instead, as a defense, the Club argues that private dance fees should be credited as an offset to the Club's minimum wage and overtime obligations under the FLSA. The Club also argues that I should exercise discretion to deny final certification because of the number of plaintiffs who have opted in. I address each of these issues below.

### *2.* Plaintiffs Are Similarly Situated Under *Zavala*

Being similarly situated "means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Zavala*, 691 F.3d at 538. The Third Circuit has adopted an "ad hoc approach" for determining at the final certification stage whether the plaintiffs are in fact "similarly situated." Factors a court may consider include: (1) whether the plaintiffs are employed in the same corporate department, division, and location; (2) whether they advance similar claims; (3) whether they seek substantially the same form of relief; (4) whether they have similar salaries and circumstances of employment. *Id*. at 536-37. The inquiry extends to questions of liability and damages. *Cf. id*. at 538 (denying final certification because "[l]iability and damages still need[ed] to be individually proven"). "Plaintiffs may also be found dissimilar based on the existence of individualized defenses." *Id*. at 537. I address each factor in turn.

   a.   All plaintiffs are employed in the same department, division, and
        location

The first *Zavala* factor directs a court to consider whether each of the plaintiffs are employed in the same department, division, and location. An affirmative finding weighs in favor

7

of final certification.  Differences in location and position of employment indicate that opt-in plaintiffs may not be similarly situated.  *See Zavala*, 691 F.3d at 538 (denying final certification where "putative class members worked in 180 different stores in 33 states throughout the county and for 70 different contractors and subcontractors").  In this case, it is clear that Verma and all opt-in plaintiffs work or worked at the same location—the Penthouse Club's single facility located at 3001 Castor Avenue.  Although the Club does not have the departments and divisions found in a traditional corporate office, all plaintiffs work or worked in the position of "dancer," with the same job duties and responsibilities.  *See* Silva Dep. at 64:16-65:24.  Therefore, this factor weighs in favor of finding that the opt-in plaintiffs are similarly situated.

### b.  All plaintiffs advance similar claims

The second *Zavala* factor directs a court to consider whether the plaintiffs advance similar claims.  In this case, each plaintiff alleges that she worked as a dancer at the Penthouse Club, that the Club misclassified her as an independent contractor rather than as an employee, and that, as a result of that misclassification, the Club failed to pay her minimum wages and overtime compensation as required under the FLSA.  Each plaintiff's FLSA claims are legally identical and rest on a common set of facts.  *Cf. e.g., Bell v. Reading Hosp. & Med. Ctr.*, No. 10-cv-592, 2011 WL 4351631, at *12 (E.D. Pa. Sept. 16, 2011) (denying final certification where the plaintiff's claims were "legally similar" but "factually divergent").  This factor clearly weighs in favor of finding that the opt-in plaintiffs are similarly situated.

### c.  All plaintiffs seek the same form of relief

The third *Zavala* factor directs a court to consider whether the plaintiffs seek the same form of relief.  In this case, all plaintiffs seek money damages for the minimum and overtime wages that the Penthouse Club failed to pay them.  Courts applying *Zavala* have indicated that

plaintiffs may satisfy this factor even where individual plaintiffs ultimately seek different dollar amounts of relief for their claims.  *See, e.g., Adami v. Cardo Windows, Inc.*, No. 12-2804, 2016 WL 1241798, at *6 (D.N.J. Mar. 30, 2016) (finding this factor satisfied where "[p]laintiffs all bring claims for unpaid overtime compensation and seek the same type of monetary and injunctive relief, although for vastly different amounts of compensation").  While plaintiffs may have individualized amounts of damages for their minimum wage and overtime claims, the *form* of relief sought by each opt-in plaintiff is the same.  Thus, this factor also weighs in favor of finding that the opt-in plaintiffs are similarly situated.

> d.  All plaintiffs have similar salaries and circumstances of
> employment

The fourth *Zavala* factor directs a court to consider whether plaintiffs have similar salaries and circumstances of employment.  In *Zavala*, The Third Circuit found that this factor was not satisfied where the putative class members "worked varying hours and for different wages."  691 F.3d at 538.   Here, by contrast, it is clear that Verma and all of the opt-in plaintiffs have the same salary—they are paid nothing by the Club.  Dancers receive compensation only from the Club's patrons, in the form of private dance fees and tips for stage dances.  Other relevant circumstances of employment are also similar among all opt-in plaintiffs.  All dancers work at the same facility, share the same responsibilities, and are subject to the same rules and policies.  Dancers maintain some flexibility in setting their own schedules, but when they work they must work one of five designated shifts over the course of the day.  This factor weighs squarely in favor of finding that the opt-in plaintiffs are similarly situated.

> 3. Private Dance Fees Do Not Offset the Club's FLSA
>       Obligations

The inquiry into whether plaintiffs are similarly situated applies to questions of damages

as well as questions of liability.  *See Zavala*, 691 F.3d at 538.  The Penthouse Club asserts that the private dance fees received by dancers from the Club's patrons should be credited toward the dancers' wages.  The Club argues that, because of these fees, the dancers are not similarly situated with regard to damages; instead, damages are either overwhelmingly individualized or nonexistent.  The Club, therefore, moves for decertification.  Verma argues that these private dance fees cannot be counted toward the Club's minimum wage and overtime obligations under the FLSA.

The FLSA requires that an employer pay a minimum wage to each employee.  29 U.S.C. § 206(a) ("Every employer shall pay to each of his employees . . . wages at the following rates . . . .").  Private dance fees are paid by customers, not the Penthouse Club, and thus the fees are not wages.  Courts have generally concluded that, for purposes of the FLSA, these fees may be either tips or service charges.  *See, e.g.*, *McFeeley v. Jackson St. Entm't, LLC*, 825 F.3d 235, 246 (4th Cir. 2016); *Hart v. Rick's Cabaret Int'l, LLC*, 967 F. Supp. 2d 901, 926-34 (S.D.N.Y. 2013).  An employer must comply with applicable regulations in order to credit private dance fees paid by customers toward his or her minimum wage and overtime obligations under the FLSA.  I address each possibility in turn.

### a.   The Penthouse Club is not eligible for a tip credit

Department of Labor regulations define a tip, for purposes of the FLSA, as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him." 29 C.F.R. § 531.52.  An employer must follow the requirements of the FLSA to credit tips toward an employee's minimum wage.  Two requirements are particularly important here.  First, the employer must pay the employee the minimum wage required for tipped employees, currently $2.13 per hour.  29 U.S.C. § 203(m).  Second, the employer must notify the employee

of the FLSA tip credit provision.  *Id*.  In this case, the Penthouse Club paid its dancers no wages

whatsoever.  *See, e.g*., First Lenahan Dep. at 201:25-202:4.  In addition, there is no evidence that

the Penthouse Club ever informed any of the dancers of the FLSA tip credit provision.  Thus, if

the private dance fees are tips under the FLSA, they cannot be credited toward the Penthouse

Club's minimum wage and overtime obligations.

     b. <u>The Penthouse Club is not eligible for a service charge offset</u>

   Department of Labor regulations define a service charge as a "compulsory charge for

service . . . imposed on the customer by an employer's establishment."  29 C.F.R. § 531.55(a).

Several federal courts have considered the question specifically at issue here: whether private

dance fees can be credited toward a club's minimum wage and overtime obligations as service

charges.  Courts have consistently found that the law imposes two requirements for an employer

to claim this credit.  First, the employer must include the service charge in its gross receipts.

Second, the employer must distribute the service charge to its employees.  *See, e.g., McFeeley*,

825 F.3d at 246 ("There are at least two prerequisites to counting 'service charges' as an offset to

an employer's minimum-wage liability. The service charge 'must have been included in the

establishment's gross receipts,' . . . and it must have been 'distributed by the employer to its

employees.'" (citations omitted)); *Henderson v. 1400 Northside Drive, Inc.*, 110 F. Supp. 3d

1318, 1322 (N.D. Ga. 2015) ("Thus, at minimum, for a fee to constitute a "service charge," it

must be (1) recorded in a company's gross receipts, and (2) distributed by the company to the

employee."); *Hart*, 967 F. Supp. 2d at 929 (concluding the FLSA requires that a service charge

be included in an employer's gross receipts and distributed by the employer).  As Judge J. Harvie

Wilkinson explained in his recent opinion, "[t]hese requirements are necessary to ensure that

employees actually received the service charges as part of their compensation as opposed to

relying on the employer's assertion or say-so." *McFeeley*, 825 F.3d at 246.

The Penthouse Club has not satisfied either of the requirements.  The Club did not include private dance fees in its gross receipts or otherwise make note of these fees in its financial records.  *See* Second Lenahan Dep. at 81:20-82:8.  The Club also did not distribute the private dance fees to the dancers.  Instead, the record indicates that private dance fees were often paid by customers directly to the dancers, who then remitted a designated portion to the Club. *See* Second Lenahan Dep. at 46:9-12.  As a result, the Penthouse Club cannot claim that private dance fees are service charges that can offset the Club's minimum wage and overtime obligations under the FLSA.

### 4. The Number of Opt-in Plaintiffs is Not Relevant to Final Certification

The Penthouse Club also argues, in passing, that the "extremely low number of opt-ins relative to the number of potential class members weighs against certification."  Def.'s Mot. to Decert. 3, ECF No. 106.    The Penthouse Club relies on a single out-of-circuit district court case to support the proposition that, where a limited number of plaintiffs have opted in, a court may "exercise[] its discretion and conclude[] an FLSA action is inappropriate."  *Keef v. M.A. Mortenson Co.*, No. 07-cv-3915 (JMR), 2009 WL 465030, at *3 (D. Minn. Feb. 24, 2009).  This argument is unavailing.  There are a number of reasons why employees, particularly in a case such as this, may decide not to opt in to a collective action.  For example, dancers still employed at the Club may fear that they will suffer negative consequences for choosing to opt in.  More importantly, the number of plaintiffs who have opted in has no direct bearing on the determinative question—whether those plaintiffs who have opted in are, in fact, similarly situated to Verma.  In the Third Circuit, once a court finds that the opt-in plaintiffs are similarly situated, the court lacks discretion to deny final certification.  *Zavala*, 691 F.3d at 535.

### 5. Conclusion

For the reasons stated above, Verma has established, by a preponderance of the evidence, that she is similarly situated to the opt-in plaintiffs. Every factor listed in *Zavala* weighs in favor of that finding. The Penthouse Club's argument that the plaintiffs have suffered no damages is simply incorrect. Whether the private dance fees earned by dancers are classified as tips or service charges, the Club has not met the requirements to claim them as an offset. I will therefore grant Verma's motion for final certification and deny the Penthouse Club's motion for decertification.

### B.  Rule 23 Class Certification

Verma also moves for Rule 23 certification of her state law claims brought under the MWA, WPCL, and Pennsylvania common law. Verma claims damages under Pennsylvania law for: (1) minimum wages; (2) overtime compensation;[9] (3) deductions for mandatory tip-outs; (4) deductions for stage rental fees; (5) deductions for fines; and (6) deductions for room rental fees. Verma's proposed class consists of: "All persons who during the period of May 31, 2010 and continuing through the entry of judgment in this case, performed as a dancer at Defendant's adult entertainment club in Philadelphia, Pennsylvania." Pl.'s Br. Supp. Sec. Rnwd. Mot. Class Cert. 4, ECF No. 104 [hereinafter Pl.'s R. 23 Br.]. The Penthouse Club opposes class certification.

### 1. Legal Standard

To warrant certification, a "class action must satisfy the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)." *Marcus v. BMW of N. Am., LLC,* 687

---

[9] Verma's minimum wage and overtime claims are brought under the MWA and mirror her FLSA claims. The MWA, unlike the FLSA, does not include its own procedural mechanism for class certification. The class certification requirements of Rule 23 apply. In similar lawsuits, federal courts have ruled on collective action certification for FLSA claims and also ruled on Rule 23 certification for comparable state law minimum wage and overtime claims. *See, e.g., Hart v. Rick's Cabaret Int'l, LLC,* No. 09 CIV 3043 JGK, 2010 WL 5297221, at *1-*2 (S.D.N.Y. Dec. 20, 2010).

F.3d 583, 590 (3d Cir. 2012).  To meet the requirements of Rule 23(a): "(1) the class must be 'so numerous that joinder of all members is impracticable' (numerosity); (2) there must be 'questions of law or fact common to the class' (commonality); (3) 'the claims or defenses of the representative parties' must be 'typical of the claims or defenses of the class' (typicality); and (4) the named plaintiffs must 'fairly and adequately protect the interests of the class' (adequacy of representation, or simply adequacy)."  *In re Cmty. Bank of N. Va.,* 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)-(4)).  In this case, Verma seeks certification under Rule 23(b)(3), which imposes the additional requirements that "(i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)."  *Cmty. Bank,* 622 F.3d at 291.  Plaintiffs seeking certification pursuant to Rule 23(b)(3) must also demonstrate that the proposed class is ascertainable.  *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015).

Plaintiffs must affirmatively demonstrate compliance with Rule 23.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-52 (2011).  Rule 23 is not a pleading standard; each requirement must be "satisf[ied] through evidentiary proof."  *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013).  "Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. To certify a class the court must thus find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008) (citation omitted).  In *Behrend*, the Supreme Court "emphasized that it 'may be necessary for the court to probe behind the pleadings before coming to rest on the certification question,' and that certification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  133 S.Ct. at 1432 (citing *Dukes*, 131 S.Ct. at

2551).

Verma contends that each Rule 23 factor is satisfied. The Penthouse Club contests the requirements of commonality, adequacy, and predominance. I address each of the Rule 23 requirements below, with particular attention to the contested factors. Because I find the predominance requirement of Rule 23(b)(3) to be determinative of some of Verma's claims, I address that factor first. I discuss the remaining Rule 23(b)(3) factors and all of the Rule 23(a) factors only as applied to Verma's three claims that survive the predominance inquiry.

## 2. Rule 23(b)(3) Factors

### a. Predominance

To satisfy the first requirement of Rule 23(b)(3), a plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 370 (3d Cir. 2015) ("[The] predominance test asks whether common issues of law or fact in the case predominate over non-common individualized issues of law or fact."). A plaintiff "must demonstrate that each essential element of his claim is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Malack v. BDO Seidman, LLP,* 617 F.3d 743, 746 n.5 (3d Cir. 2010). If proof of an essential element of the cause of action requires "individual treatment," then class certification is "unsuitable." *In Re: Hydrogen Peroxide Antitrust Litigation*, 552 F.3d at 311.

In *Behrend*, the Supreme Court confirmed that the same "rigorous analysis" standard that applies to the class certification requirements under Rule 23(a) applies to the predominance requirement under Rule 23(b)(3). 133 S. Ct. 1426, 1432 (2013) ("The same analytical principles govern Rule 23(b). If anything, Rule 23(b)(3)'s predominance criterion is even more demanding

than Rule 23(a).").  Performing a rigorous analysis may require courts to examine the evidence

presented in the entire case at the class certification stage to determine whether questions of law

or fact—including liability, affirmative defenses, and damages—"will inevitably overwhelm

questions common to the class." *Behrend*, 133 S. Ct. at 1433.  Predominance may be

established, however, even where the plaintiffs cannot prove damages on a class-wide basis.

*Neale*, 794 F.3d at 375 ("[I]t is 'a misreading of *Comcast*' to interpret it as 'preclud[ing]

certification under Rule 23(b)(3) in any case where the class members' damages are not

susceptible to a formula for classwide measurement.'" (quoting *In re Deepwater Horizon*, 739

F.3d 790, 815 & n.104 (5th Cir. 2014))).

Verma has brought claims under the MWA, WPCL, and Pennsylvania common law and

seeks damages for: (1) minimum wages; (2) overtime compensation; (3) deductions for

mandatory tip-outs; (4) deductions for stage rental fees; (5) deductions for fines; and (6)

deductions for room rental fees.[10]  For each of these claims, the key inquiry is whether common

questions of law and fact predominate with regard to damages.  For each category of damages,

Verma has proposed a methodology for calculating classwide damages and a common

methodology for calculating a dancer's individual damages.  The Penthouse Club's main

contention relating to class certification is that Verma cannot satisfy the predominance

---

[10] Verma's Complaint asserts violations of the MWA for failure to pay minimum wages (Claim 3) and overtime compensation (Claim 4).  Compl. at 20-21, ECF No. 1.  In addition to these claims, the Complaint asserts one claim for violations of the WPCL (Claim 5) and one claim for unjust enrichment under Pennsylvania common law (Claim 6).  Compl. at 21-23, ECF No. 1.  It is not precisely clear from Verma's pleadings and briefs whether the damages for tip-outs, stage rental fees, fines, and room rental fees are asserted under Claim 5, Claim 6, or both.  For purposes of Rule 23 certification, I will assume that all four categories of damages are asserted under both Claims 5 and 6.

In order to prevail on her WPCL claim, Verma will need to prove that, as a result of any or all of the Club's deduction policies, the Club has deducted or failed to pay the dancers wages that are due and owing to them.  *See* 43 Pa. Cons. Stat. § 260.3.  To prevail on her unjust enrichment claim, Verma will need to prove that any or all of the Club's deduction policies have resulted in a benefit conferred on the Club, which the Club has appreciated and retained under inequitable circumstances.  *See, e.g.*, *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328 (Pa. Super. Ct. 1995) (discussing elements of unjust enrichment under Pennsylvania law).

requirement for any of her alleged damages.  I address each category of damages below.

### i. *Minimum Wages*

Verma alleges that the Penthouse Club violated the MWA by failing to pay dancers a minimum wage.  It is uncontested that the Club classified all dancers as independent contractors and that the Club continues to pay dancers nothing to perform.  I already found that this is legally improper—the dancers are employees.  To calculate damages of the dancers as employees, Verma's expert has relied on records produced by the Club that list the total number of hours worked by all dancers for each day during a 25-month period.  *See* Pl.'s R. 23 Br. at Ex. F. Verma's expert proposes that classwide damages can be determined by multiplying the total number of hours worked by all dancers by the minimum wage of $7.25.  *See Id*. at 24.  For a two-year period from November 2011 to November 2013, Verma's expert has calculated that classwide minimum wage damages equal $688,125.63.  *Id*. at Ex. F.  Verma's expert proposes that he can then use the house mom records and entertainer time sheets to compile the total number of hours worked by each individual dancer.  *See Id*. at 31.  Applying this common methodology, an individual dancer's minimum wage damages can be calculated by multiplying the total number of hours she worked by $7.25.[11]  *Id*. at 30-31.  To the extent that the Club's records are incomplete, Verma's expert proposes that class members may provide testimony regarding individual shifts and hours worked.  *Id*. at 25.

Common issues of law and fact predominate.  To prevail on her claim, Verma must show that the dancers are nonexempt employees of the Club, that the Club had a uniform policy of paying dancers no wages, and that the dancers therefore failed to receive minimum wage.  Every element of the claim can be proven on a classwide basis, and Verma's proposed damages model

---

[11] The federal minimum wage is $7.25.  29 U.S.C. § 206.  Under the MWA, the Pennsylvania minimum wage is currently equivalent to the federal minimum wage.  *See* 43 Pa. Cons. Stat. § 333.104(a.1).

matches her theory of liability.  The only individualized question is the precise apportionment of damages among the class members.  This, alone, does not defeat predominance.  *See, e.g., Neale*, 794 F.3d at 375 (noting that "individual damages calculations do not preclude class certification").  The Penthouse Club argues that "on a classwide basis there are no damages." Def.'s Mem. Opp. Class Cert. 6, ECF No. 110 [hereinafter Def.'s R. 23 Mem.].  This is the same argument that the Club propounded in defense of Verma's FLSA minimum wage claim, and it fails for the same reason—private dance fees paid by the Club's customers do not offset the Club's minimum wage obligations.[12]  Verma has shown, by a preponderance of the evidence, that common issues of fact and law predominate in her MWA minimum wage claim.

### ii.    *Overtime Compensation*

Verma alleges that the Penthouse Club also violated the MWA by failing to pay dancers time-and-a-half for every hour worked in excess of forty per week.  As previously noted, the Club did not pay dancers wages for any hours worked, including overtime hours.  Verma's expert proposes to use the house mom records (Ex. H), which contain the hours worked by each dancer for each shift, as well the Club's records that list the total number of hours worked by all dancers for each day (Ex. F), to tabulate the total number of shifts and hours worked by each dancer during each week of the class period.  *See* Pl.'s R. 23 Br. at 26.  From this tabulation, Verma's expert will then aggregate each individual dancer's overtime hours, i.e., the number of hours worked in excess of forty per week.  Because the Club failed to pay dancers any wages, each dancer's overtime damages can be calculated by multiplying her total number of overtime

---

[12] Although it appears that Pennsylvania courts have never directly addressed the question of whether private dance fees are wages under the MWA, much of the MWA's definition of wages is identical to the FLSA definition.  The MWA definition adds the additional clarification that "'wages' mean compensation due to any employe[e] *by reason of his or her employment*." 43 Pa. Cons. Stat. § 333.103 (emphasis added).  Private dance fees are clearly not due to the dancers by reason of their employment.  A dancer may work a full shift without receiving any private dance fees.  The fees are paid to the dancer by a customer of the Club only if she performs a specific service for that customer.

hours by the minimum overtime wage of $10.875.[13]   *Id.* at 26.

As with Verma's minimum wage claim, common issues of law and fact predominate.  To establish liability, Verma must prove that the dancers are nonexempt employees of the Club, that dancers sometimes worked in excess of forty hours per week, and that the Club uniformly failed to pay dancers any overtime compensation.  Although the Club asserts that no dancer ever worked more than 40 hours in a given week, this contested issue of fact can be resolved through the common methodology that Verma has proposed.  If Verma is able to establish liability, individual damages can be calculated formulaically using the common methodology Verma has proposed.  Verma has shown, by a preponderance of the evidence, that common issues of fact and law predominate in her MWA overtime claim.

### iii.   *Deductions for Mandatory Tip-outs*

Verma alleges that the Penthouse Club violated the WPCL and Pennsylvania common law by requiring dancers to "tip out" to other individuals who worked at the Club.  Verma has provided evidence—in particular, a schedule of mandatory tip-outs that was posted in the Club—indicating that, for each shift, regardless of time or length, dancers are required to pay $15 to the disc jockey, $10 to the house mom, and $5 to the podium host.  *See* Pl.'s R. 23 Br. at 27 & Ex. D.  She has also alleged that dancers are required or strongly encouraged to tip out at least $6 to the valet.  *Id.* at 27.  Thus, the alleged minimum tip-out for each shift is $36.  Based on the records produced by the Club, Verma's expert has calculated that dancers worked a total of 16,745 shifts during a 2-year period from November 2011 to November 2013.[14]  Verma's expert

---

[13] Under the MWA, an employee's minimum overtime wage is equivalent to one and one-half times the regular wage.  Therefore, employees who earn or are entitled to earn the minimum wage of $7.25 per hour are also entitled to earn a minimum overtime wage of $10.875 per hour.

[14] Although Verma has not described precisely how this number was calculated, it appears that Verma's expert divided the total number of hours worked during this period (as listed in Exhibit F) by the average shift length.  A more conservative estimate of the number of shifts worked may require that

proposes that classwide damages can be calculated by multiplying the total number of shifts worked during the class period by the $36 minimum tip-out per shift.[15]   *See* Pl.'s R. 23 Br. at 26. The house mom records and entertainer time sheets could then be used to tabulate the number of shifts worked by each dancer.  An individual dancer's tip-out damages would be equal to her total number of shifts multiplied by $36, or some other established minimum tip-out amount.

To prevail on this claim, Verma must prove that the Club enforces the mandatory tip-out requirement for all dancers during all shifts, and that the imposition of this requirement constitutes an unlawful deduction under the WPCL or unjust enrichment under Pennsylvania law.  These questions of liability can be resolved on a classwide basis.  The Penthouse Club has not asserted any individualized defenses.  Verma's proposed damages methodology matches her theory of liability.  If liability is proven, apportioning individual damages from classwide damages will be formulaic; an individual dancer's tip-out damages would be equal to her total number of shifts worked multiplied by the minimum tip-out amount.  Verma has shown, by a preponderance of the evidence, that common issues of fact and law predominate.

*iv.   Deductions for Stage Rental Fees*

Verma alleges that the Penthouse Club violated the WPCL and Pennsylvania common law by requiring dancers to pay a stage rental fee in order to work at the Club.   The amount of the fee varies depending on the dancer's status as an Entertainer or Freelancer and the shift worked.  *See* Pl.'s R. 23 Br. at 6 & Ex. D.  For certain shifts, the Club charges no stage rental fee at all, but for others the fee may be as much as $85.  *Id.*  Verma proposes that classwide damages

---

Verma divide the total number of hours worked by the longest shift worked.

[15] The precise amount of the mandatory tip-out is a question of fact properly resolved at trial.  For purposes of class certification, the relevant question is whether Verma has proposed a common methodology for calculating damages, based on the facts that are proven at trial.  For this claim she has. For example, if it is proven at trial that the minimum mandatory tip-out is $30 instead of $36, Verma could still accurately calculate damages using her proposed methodology.

can be determined from the Club's records showing total stage rental fees collected from all dancers for each day over a two year period.  *See* Pl.'s R. 23 Br. at 26-27 & Ex. G.  Verma asserts that individual damages "can be determined by considering the number of shifts worked in conjunction with the class members' classification as either an 'Entertainer' or 'Freelancer.'"  *Id*. at 32.

As with Verma's prior claims, the legal questions underlying this claim can be resolved on a classwide basis.  The factual questions, however, are far more individualized.  For any given shift, the stage rental fee paid by a dancer depends on both her classification and the shift she has chosen to work.  For certain shifts, the Club does not charge any fee.  In addition, the Club has provided some evidence that stage rental fees were not always collected, particularly if a dancer failed to make money from customers during her shift.  *See, e.g.*, Silva Dep. at 219:11-25.  Given the individualized nature of these critical facts, it is unclear that Verma would be able to prove liability or damages on a classwide basis.  In addition, Verma has not offered a workable common methodology for calculating individual damages.  Individual damages would depend on not only a dancer's classification and the number of shifts worked, but also the timing of each shift and, potentially, whether the Club actually charged a stage rental fee for each shift.  Because Verma has not shown, by a preponderance of the evidence, that common questions of fact predominate, I will deny class certification of this claim.

*v.    Deductions for Fines*

Verma alleges that the Penthouse Club violated the WPCL and Pennsylvania common law by requiring dancers to pay fines.  Verma alleges that the Club charges a dancer a $10 fine for every 30 minutes she is late and imposes various fines for other violations of Club rules.  Verma notes that there is some documentation of these fines, covering a portion of the class

period.  She states, "To the extent the Defendant's records are complete with regard to the fines

it imposed upon the dancers, this element of damages can be proven directly on a classwide

basis."  Pl.'s R. 23 Br. at 26-27.  Verma's expert asserts that, based on class member interviews,

the average fine paid by each dancer was $24 per shift.  *Id*. at 31-32.  Verma, however, has

offered little information to substantiate this calculation. In his report, Verma's expert simply

states that the $24 average fine was "established based on interviews with Collective Action

Members."  *See* Pl.'s R. 23 Br., Ex. E at 7.  Verma has offered no further suggestion for

calculating damages through a common methodology.

As Verma's own allegations reveal, the Club assessed these fines on an individual basis,

in response to conduct by a particular dancer.  In that regard, they differ significantly from a

uniform, mandatory tip-out assessed to every dancer at the end of each shift.  Although Verma

may be able to prove that the Club established general policies regarding the assessment of fines,

Verma would need to offer evidence that these policies were uniformly enforced in order to

establish liability on a classwide basis.  Damages depend entirely on the individual conduct of

each dancer.  These factual inquiries cannot be resolved on a classwide basis.  Because Verma

has not shown, by a preponderance of the evidence, that common questions of fact predominate,

I will deny class certification of this claim.

*vi.*    *Deductions for Room Rental Fees*

Verma alleges that the Penthouse Club violated the WPCL and Pennsylvania common

law by requiring dancers to pay room rental fees for private dances.  The Penthouse Club sets

uniform, non-negotiable prices that customers must pay for these private dances: a four-minute

dance costs $30, of which the dancer receives $20 and the Club retains $10; a half-hour dance

costs $300, of which the dancer receives $175 and the Club retains $125; a one-hour dance costs

22

$500, of which the dancer receives $300 and the Club retains $200.  In order to calculate classwide damages, Verma's relies on records produced by the Club showing the aggregate amount of money retained by dancers for private room dances for each day over a 2-year period. Using the $20/$10 ratio, Verma proposes that classwide damages for this period are equal to one half of the aggregate amount of money retained by dancers for private room dances.  Pl.'s R. 23 Br. at 28-29.  Verma claims that individual damages can then be determined from the limited podium records that exist, or from the testimony of individual dancers.  *Id*. at 32.

Similar to Verma's stage rental fees claim, common questions of law may predominate, but common questions of fact do not.  The existence and amount of a class member's damages depends on a highly individualized factual inquiry.  A class member must establish whether, during each of her shifts, she performed any private dances and, if so, how many and of what length.  These facts are necessary to prove the claim.  Because Verma has not shown, by a preponderance of the evidence, that common questions of fact predominate, I will deny class certification of this claim.

*vii.    Conclusion*

Verma has shown that common questions of law and fact predominate for her minimum wage, overtime, and tip-out claims.  Verma has failed to show, by a preponderance of the evidence, that common questions of law and fact predominate with regard to her claims for stage rental fees, fines, and room rental fees.  I will therefore deny class certification for those claims.

b.  <u>Superiority</u>[16]

To satisfy the second requirement of Rule 23(b)(3), a plaintiff must show "that a class action is superior to other available methods for fairly and efficiently adjudicating the

---

[16] I address both superiority and ascertainability only as applied to Verma's three claims that survive the predominance inquiry: minimum wages, overtime, and tip-outs.

controversy." Fed. R. Civ. P. 23(b)(3). A plaintiff must demonstrate that a class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); *see also Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001) ("Superiority calls for a determination that a class action is the best method of achieving a fair and efficient adjudication of the controversy.").

Verma argues that a class action is a superior means of maintaining this action because (1) the class members do not have a strong interest in individually controlling their claims because, for many of them, the damages will be relatively modest; and (2) the class action will promote judicial economy while providing a local forum for the action. The Penthouse Club has not contested superiority.

Both of Verma's arguments weigh in favor of superiority. In particular, it appears that there may be a number of putative class members who worked at the Penthouse Club for only a brief period of time. For these dancers, the costs of pursuing an individual action would almost certainly outweigh any potential recovery. A class action may also be superior for putative class members who continue to work at the Penthouse Club. *See, e.g., Hart*, 2010 WL 5297221, at *7 (noting, in a similar case, that "the fact that members of the putative class who currently work as entertainers for the defendants may be reluctant to pursue any claims against the source of their current income" weighs in favor of superiority). Verma has shown, by a preponderance of the evidence, that a class action is the superior method of resolving her claims.

c.  Ascertainability

In addition to satisfying the explicit requirements of Rule 23(b)(3), a plaintiff seeking

class certification must prove by a preponderance of the evidence that the proposed class is ascertainable. *See Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). "The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Id.* (internal quotation marks omitted). This requirement "does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that class members can be identified." *Id*.

In this case, Verma's proposed class includes all dancers who performed at the Penthouse Club between May 2010 and the entry of judgment. The class definition is objective; an individual's membership in the class depends only on whether she worked as a dancer at the Penthouse Club during the specified time period. Verma has identified records maintained by the Club—specifically, an index of dancer performance contracts—as a reliable and administratively feasible means of identifying class members. Pl.'s R. 23 Br. at Ex. M. Verma has shown, by a preponderance of the evidence that the proposed class is ascertainable.

### 3. Rule 23(a) Factors[17]

#### a. Numerosity

To satisfy the first requirement of Rule 23(a), a plaintiff must show that the proposed class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40," the numerosity requirement "has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir.

---

[17] I address each of the Rule 23(a) factors only as applied to Verma's three claims that survive the predominance inquiry: minimum wages, overtime, and tip-outs.

2001).  In this case, Verma has presented evidence that at least 318 dancers are members of the proposed class.  Pl.'s R. 23 Br. at Ex. M.  Verma has shown, by a preponderance of the evidence, that the proposed class is sufficiently numerous.

b.  <u>Commonality</u>

To satisfy the second requirement of Rule 23(a), a plaintiff must show "that there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The commonality inquiry asks whether class members' claims depend upon a common contention and whether "[t]hat common contention . . . [is] of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 131 S. Ct. at 2551.  The commonality requirement is generally considered to be less stringent than the predominance requirement of Rule 23(b)(3).  *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) ("The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. Because the requirement may be satisfied by a single common issue, it is easily met . . . ." (internal citations omitted)).

Verma asserts that her claims depend on several common questions of law and fact, including whether dancers are employees rather than independent contractors.  Although the Penthouse Club challenges commonality, it does so only by folding the inquiry into predominance.  For the reasons described in my analysis of predominance, I find that Verma has shown, by a preponderance of the evidence, that there are questions of law and fact that are common to the class.

### c.  Typicality

To satisfy the third requirement of Rule 23(a), a named plaintiff must show that his or her claims and defenses are "typical of the claims and defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality inquiry asks "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 295-96 (3d Cir. 2006). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton*, 259 F.3d at 183-84.

In this case, the Penthouse Club classified all dancers as independent contractors, paid all dancers no minimum and overtime wages, and subjected all dancers them to the same common rules regarding tip-outs.  All of Verma's claims "arise from the same . . . practice or course of conduct." *Baby Neal*, 43 F.3d at 58.  Verma has shown, by a preponderance of the evidence, that her claims are sufficiently typical of the class.

### d.  Adequacy

To satisfy the fourth requirement of Rule 23(a), a named plaintiff must show that he or she "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This requirement includes "two components: (1) concerning the experience and performance of class counsel; and (2) concerning the interests and incentives of the representative plaintiffs." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181-82 (3d Cir. 2012).  The adequacy requirement "assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class."  *Baby Neal*, 43 F.3d at 55.

Verma asserts that she is an adequate representative of the proposed class because she shares that same claims as the class members, she has worked to advance the interests of the class, and each class member is likely to benefit from the litigation. *See* Pl.'s R. 23 Br. at 20. The Penthouse Club claims that Verma is an inadequate class representative because of a conflict of interest. Specifically, the Club argues that the prospective class members, in total, earned more from private dance fees ($3,322,032.86) than they would have were they simply paid minimum wage ($688,125.63). *See* Def.'s R. 23 Mem. at 4.

In order for a class representative to meet the adequacy requirement, the representative "must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prods.*, 521 U.S. at 626-27 (citations omitted). The Third Circuit has clarified that "the linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class," and that only a "fundamental" conflict violates the adequacy requirement of Rule 23(a)(4). *Dewey*, 681 F.3d at 183. "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* at 184 (quoting *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). "A conflict that is unduly speculative, however, is generally not fundamental." *Id.*

The Penthouse Club asserts that "[p]rospective class members actually benefit from the challenged conduct." *See* Def.'s R. 23 Mem. at 3. The Club appears to imply that dancers would receive less money from patrons were the Club required to pay minimum wage. This assertion, however, appears to rest upon a fundamental misunderstanding of Verma's claims and relies upon the type of speculation the Third Circuit has expressly rejected. It is irrelevant that the putative class members may have received more compensation from the Club's customers, in

28

the aggregate, than they would have received were they compensated only through minimum wage. Under the terms of the MWA, if the putative class members are non-exempt employees of the Penthouse Club, they are entitled to be paid minimum wage by the Club, regardless of any compensation received from the Club's customers. *See* 43 Pa. Cons. Stat. §§ 333.103(d)(1), 333.113. Thus, all putative plaintiffs suffered the same injury (failure to receive minimum wage) due to the Club's uniform policy of classifying all dancers as independent contractors and not paying minimum wage. At this stage, any assertion that the imposition of a minimum wage requirement would alter the amount of compensation that the putative class members receive from the Club's customers would be unduly speculative. There is not a conflict between Verma and the putative class members.

The Club has not contested the adequacy of class counsel. Verma's counsel has been involved in numerous class actions, including wage and hour class actions such as this one. *See* Pl.'s R. 23 Br. at Exs. N & O. Verma has shown, by a preponderance of the evidence, that both she and her counsel are adequate representatives of the class.

## III.   CONCLUSION

For the preceding reasons, Verma has shown that she is similarly situated to the opt-in plaintiffs. I will therefore grant Verma's motion for final certification of the FLSA collective action and deny the Penthouse Club's motion for decertification of the FLSA collective action. Verma has also satisfied each of the requirements of Rule 23 for her minimum wage, overtime, and tip-out claims brought under Pennsylvania state law. I will grant Verma's motion for Rule 23 class certification for those claims only and will deny class certification for Verma's claims for stage rental fees, fines, and room rental fees.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies VIA ECF on _____ to:          Copies MAILED on _____ to: