UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| PRIYA VERMA ON BEHALF OF | ) | 13-CV-03034 |
| HERSELF AND ALL OTHERS | ) | |
| SIMILARLY SITUATED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| 3001 CASTOR, et al, | ) | Philadelphia, PA |
| | ) | June 24, 2014 |
| Defendants. | ) | 2:02 p.m. |


TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE ANITA B. BRODY
UNITED STATES DISTRICT JUDGE


APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | GARY F. LYNCH, ESQUIRE |
| | CARLSON LYNCH SWEET KILPELA & |
| | CARPENTER, LLP |
| | 1133 Penn Avenue, 5th Floor |
| | Pittsburgh, PA  15222 |
| | |
| | GERALD D. WELLS, III, ESQUIRE |
| | CONNOLLY WELLS & GRAY, LLP |
| | 2200 Renaissance Blvd, Suite 275 |
| | King of Prussia, PA  19406 |
| | |
| For the Defendant: | JOHN F. INNELLI, ESQUIRE |
| | JOHN F. INNELLI, LLC |
| | Two Penn Center, Suite 1300 |
| | Philadelphia, PA  19102 |
| | |
| Audio Operator: | JAMES F.G. SCHEIDT |
| | |
| Transcribed by: | DIANA DOMAN TRANSCRIBING, LLC |
| | P.O. Box 129 |
| | Gibbsboro, New Jersey  08026 |
| | Office:  (856) 435-7172 |
| | Fax:     (856) 435-7124 |
| | Email:   dianadoman@comcast.net |


Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                             I N D E X

2

3         ARGUMENT:                                    PAGE

4         Re:  Motion for summary judgment

5           By Mr. Innelli                           4, 9, 10

6           By Mr. Wells                                9, 15

7         Re:  Class 23 certification

8           By Mr. Lynch                                  18

9         Re:  Supplemental jurisdiction

10          By Mr. Lynch                                  21

11          By Mr. Innelli                                27

12        Re:  Motion to strike affidavit

13          By Mr. Wells                              31, 37

14          By Mr. Innelli                            32, 39

15        Re:  Motion for summary judgment in lieu of motion to dismiss

16          By Mr. Innelli                                41

17

18

19

20

21

22

23

24

25

Colloquy                                        3

1          (The following was heard at 2:02 p.m.)

2          THE COURT:  Okay --

3          COURTROOM DEPUTY:  All ready, Your Honor.

4          THE COURT:  -- we're here in the matter of Verma vs.

5     3001 Castor Ave., Inc., et al, okay?  And I believe that the

6     motions -- number one, you have a motion to certify, isn't

7     that correct?  And you are Mr. Lynch?

8          MR. LYNCH:  Your Honor, yes, I'm Mr. Lynch.  This is

9     Gerry Wells.

10         THE COURT:  Oh, Mr. Wells.  You're the one that

11    appeared, Mr. Wells, last time in front of me.

12         MR. WELLS:  Yes, Your Honor.

13         THE COURT:  Okay, I'm sorry.

14         MR. WELLS:  That's quite all right.

15         THE COURT:  Are you going to be arguing today?

16         MR. WELLS:  Your Honor, I will be arguing the motion

17    for summary judgment, response thereto, as well as the motion

18    to strike the affidavit.

19         THE COURT:  And who will be arguing the

20    certification?

21         MR. LYNCH:  I will, Your Honor.

22         THE COURT:  All right, Mr. Lynch.  Okay.  And, Mr.

23    Innelli, you'll be arguing everything, is that correct?

24         MR. INNELLI:  Yes, Your Honor.

25         THE COURT:  Okay.

 1            MR. INNELLI:  Thank you.

 2            THE COURT:  All right, thank you.  Let's start --

 3    the first motion is the motion to certify so let's start off

 4    with that.  I think on my docket that's the first one.  Okay.

 5            MR. LYNCH:  Your Honor, do you want me to argue from

 6    the podium or --

 7            THE COURT:  Whichever is your preference.  I'll take

 8    you at the podium or take you where you are.

 9            MR. LYNCH:  I can do it from here if you can hear me

10    okay, Your Honor.

11            THE COURT:  Okay.  Now, the way I -- Mr. Innelli,

12    you're going to have to -- as a matter of fact, you know, I'm

13    not going to do it.  I'm going to do summary judgment first

14    because if you don't get past summary judgment, the rest

15    becomes on the issue of whether or not the defendant is an

16    employer, okay?  So I'm going to let you go first on that, Mr.

17    Innelli.

18            MR. INNELLI:  Thank you, Your Honor.  Your Honor, as

19    we set forth in our reply brief in support of our motion for

20    summary judgment, the standard in the Third Circuit in

21    determining whether an individual is an employee or --

22            THE COURT:  For the purposes of the Fair Labor

23    Standards Act --

24            MR. INNELLI:  Yes.

25            THE COURT:  -- not employee in general because you

1  could be an employee for tax purposes and not be an employee

2  under the Fair Labor Standards Act --

3            MR. INNELLI:  That's --

4            THE COURT:  -- so this is just the Fair Labor

5  Standards Act.

6            MR. INNELLI:  That's correct.

7            THE COURT:  Okay.

8            MR. INNELLI:  The standard is set out in <u>DialAmerica</u>

9  and as we quote in our brief, the Third Circuit and pertinent

10  part set in <u>DialAmerica</u>, "In summary, all of the factors in

11  the <u>Sureway Cleaners</u> test" -- which is out of the Ninth

12  Circuit --

13            THE COURT:  Yes.

14            MR. INNELLI:  -- "when applied to the distributors,

15  do not lead to the same conclusion.  Having considered the

16  evidence with appropriate deference to the District Court's

17  fact-finding, we note that some factors support the conclusion

18  that the distributors are 'employees,' while others do not.

19  Although the question is admittedly close, we hold that the

20  distributors *qua* distributors were not employees under the

21  LFSA (sic) because" --

22            THE COURT:  The Fair Labor Standards Act?

23            MR. INNELLI:  Yes.

24            THE COURT:  Okay.

25            MR. INNELLI:  -- "because they operated more like

1   independent contractors than like employees of <u>DialAmerica</u>.

2   The distributors were subject to minimal oversight or control

3   over the distribution activities."  And here's what we believe

4   to be the key language.  "Moreover, they faced a real

5   opportunity for either a profit or loss in their operations,

6   depending upon the amount of their investment and their skills

7   in management."

8              And in the case at bar, we have a restaurant and

9   bar --

10             THE COURT:  A what?

11             MR. INNELLI:  A restaurant and bar that has a

12  license -- a cabaret license.  It's 3001 Castor, Inc.

13             THE COURT:  What does it mean by saying a cabaret

14  license?

15             MR. INNELLI:  That they can have live entertainment

16  including erotic dancers --

17             THE COURT:  All right.

18             MR. INNELLI:  -- which is what they have at 3001

19  Castor, Inc.

20             THE COURT:  Okay.

21             MR. INNELLI:  3001 Castor, Inc. licenses the use of

22  the name "Penthouse" and is known in the community as the

23  Penthouse Club.

24             THE COURT:  Is that an A/K/A?

25             MR. INNELLI:  It's -- it's not a registered --

1              THE COURT:  Do you want to call it the Penthouse

2     Club today for the purposes of today's argument?

3              MR. INNELLI:  If the Court would like me to.

4              THE COURT:  Well, whatever you -- it's your

5     preference.

6              MR. INNELLI:  I would prefer to say 3001 Castor,

7     Inc. --

8              THE COURT:  Okay, that's fine.

9              MR. INNELLI:  -- because they are the named -- they

10    are the named defendant.

11             THE COURT:  Okay, sure.

12             MR. INNELLI:  And as I said, all they do is license

13    the name.  They are not in any other way affiliated with any

14    other business activities that the Penthouse organization has

15    had in the past or may have in the future.  The punitive class

16    and the Plaintiff, Ms. Verma, come to 3001 Castor seeking the

17    opportunity to appear there.

18             They are individuals who were in business for

19    themselves.  All they need to do is to enter into an agreement

20    which tells them that they are in fact independent contractors

21    and that the only restrictions that exist upon them is that

22    they cannot use illicit drugs -- they cannot use drugs, and

23    they cannot engage in any sexual acts.

24             THE COURT:  They have to dress a certain way, don't

25    they?

1          MR. INNELLI:  Well, they have to wear clothing that

2     one would wear in their profession.

3          THE COURT:  But they are told by 3001 that they have

4     to wear certain things, isn't that correct?

5          MR. INNELLI:  3001 makes suggestions as to what kind

6     of shoes they should wear.  They have to wear a clothing

7     attire which they select.  I will tell the Court in all candor

8     as a result of representing the club, I have been there on

9     several occasions now and the attire runs a wide -- wide

10    range.

11         What the women quite honestly are doing are creating

12    a fantasy so you may have one dancer wearing a cowboy outfit

13    which they take off in due course, another one wearing one

14    type of clothing that is more akin to what we think strippers

15    wear.  It runs a wide gamut.  What the club does like to see

16    though is that the women present themselves in a way which is

17    viewed as professional.

18         THE COURT:  Well, I want to ask you, isn't it -- I

19    just want to make sure I have the facts as they have been

20    elicited, is that they -- I mean, if they don't wear the right

21    clothing, then you can prohibit them from performing, isn't

22    that correct?

23         MR. INNELLI:  I don't believe so.  I don't believe

24    that's what the evidentiary record is.  The only --

25         THE COURT:  Well --

1           MR. INNELLI:  The only --

2           THE COURT:  -- what's your position on that, Mr.

3    Lynch?  Oh, I'm sorry, Mr. Wells is arguing.

4           MR. WELLS:  Your Honor, our position --

5           THE COURT:  I'm going to do this, you know, back and

6    forth.

7           MR. INNELLI:  That's fine.

8           THE COURT:  You've been before me.

9           MR. INNELLI:  I think it facilitates things, Your

10   Honor.

11          THE COURT:  Yes.

12          MR. WELLS:  Your Honor, our position is that the

13   clubs require certain clothing to be worn, effectively

14   stripper attire, for lack of a better term, and that is

15   frankly in the record that our client did testify to that,

16   that she was required to wear certain clothing and that she

17   also testified that she had to have heels of a certain length

18   and the like.

19          And that in fact, they went so far as they couldn't

20   permit her hair to be worn down, they -- I'm sorry, worn up,

21   that they had strict requirements with respect to the dancer's

22   appearance.

23          THE COURT:  All right.  Is that true about the hair?

24          MR. INNELLI:  Well, that's not what the testimony

25   given by the gentleman who was one of the managers that was

1  deposed by the -- the plaintiff -- by the plaintiff.  The

2  attire is, as we said, for exotic dancing but it runs a wide

3  range.  They do prefer that the women have their hair down.

4  No one has ever been told you can't rent stage time here

5  because your hair has been up.

6          THE COURT:  Well, it seems to me that there's a

7  question of fact here and therefore I would think that I have

8  to -- I think as a Judge I would make the final determination

9  of that, but I have to make that after evidence which would

10  mean at trial.

11          MR. INNELLI:  Well, that is true and I understand

12  what the standard is on a motion for summary judgment.  Maybe

13  I should go a little bit faster to --

14          THE COURT:  No --

15          MR. INNELLI:  -- to the issue with regard to the

16  opportunity for entrepreneurial-ship, as the Courts have

17  become more accustomed to speaking.  The import of what the

18  Third Circuit said in <u>DialAmerica</u> was that while there are a

19  number of factors, not any one factor rules.

20          But it says, "Moreover, they face" -- "Moreover,

21  they faced a real opportunity for either a profit or loss in

22  their operations, depending upon the amount of their

23  investment and their skills in management."

24          Now, the Third Circuit was very prescient when it

25  said that in 1985.  Since 1985 our national economy has

1   changed and the issue of control over a prospective employee

2   has not been clear-cut.  It used to be the common law of

3   agency.  What has happened, and we've seen this in the Ninth

4   Circuit and we've seen it in the District Court -- District of

5   Columbia Circuit, there's been a recognition that because it's

6   difficult to determine what is actual control, saying that

7   someone should not wear their hair up, is that really control?

8          The Courts in D.C. in <u>Federal Exchange Home Delivery</u>

9   <u>vs. NLRB</u> which we cite in our briefs and make reference to

10  said that, "The test for time focused on an employer's right

11  to exercise control over the means and manner of the worker's

12  performance."  The U.S. Circuit Court of Appeals lamented

13  that did not mean all kinds of controls, but only certain

14  kinds.

15         And then what it did is it looked to a 2002 opinion

16  that it wrote, <u>Corporate Express Delivery Services vs. NLRB</u>,

17  wherein the Third Circuit upheld -- they enforced the NLRB's

18  determination that the status of owner-operated truckers who,

19  despite the contractual title of "independent contractors"

20  were in fact employees because the agreement that they had,

21  even though it was called an "independent contractor

22  agreement" restricted the owner-operator truckers from hiring

23  helpers or using their vehicles for other jobs.

24             So it led the D.C. Court to say -- the D.C. Circuit

25  Court to say the truckers lacked -- "lacked all

1    entrepreneurial opportunity" and thus are employees, and that

2    is really where the Courts have been moving and that's in

3    large step with what the Third Circuit said back in 1985.  You

4    look not just to control, but to whether in the course of the

5    business transaction does the party face the real opportunity

6    for either profit -- either a profit or a loss in their

7    operations, and that's what is key here in this case.

8           The dancers come to the club, they enter into an

9    agreement.  The only two restrictions on them is that no drugs

10   and no sex.  For that, you will not be allowed back on stage.

11   The dancers then decide do they want to dance, when do they

12   want to dance.  They select the days, they select the shifts.

13          The day shifts, the afternoon to 2:00 or 3:00

14   period; the 3:00 to 6:00 period; the 6:00 to 8:00 period are

15   ones where there are fewer patrons coming in.  They don't pay

16   -- the dancers don't pay anything for the dance time to be up

17   on stage.

18          Where the dancers make their money is in providing

19   private dances known as "lap dances," and that's all based

20   upon the work done by the dancers -- their socializing with

21   the patrons, their -- whatever fantasy they create when

22   they're up on the stage, if they're busy socializing with a

23   patron or giving a private dance, they can't be called to go

24   back up on stage.

25          They rent stage time.  They rent it to the degree

1    they want, when they want and there are varying rental charges

2    from zero -- 60 percent of the shifts, the time periods where

3    they can rent time, they pay nothing.  They pay absolutely

4    nothing.  The time periods that are most popular, they have to

5    pay a fee and that's to bring about some sort of coordination

6    so that we don't have people tripping over themselves and

7    becoming hurt.

8              When a private dance is performed, it's for a four-

9    minute period and there is a $10 rental fee that has to be

10   paid for the room, and the dancer gets $20.  And the parties

11   -- that is 3001 Castor, Inc. and the women who choose to

12   appear there, have entered into an agreement that it be $30

13   for the four months --

14             THE COURT:  Four minutes you mean.

15             MR. INNELLI:  For four minutes, yes, I'm sorry.

16             THE COURT:  Four months would be a long time.

17             MR. INNELLI:  Yes, I'm sorry -- for purposes of

18   protecting the safety of both the safety of the dancer and the

19   patron.  There can be no dispute over what was agreed to and

20   what time period, what length of time, what the dollar amount

21   was.  So the dancers decide where they want to dance, whether

22   it's at 3001 Castor, Inc. or any one of the other 16 strip

23   joints and gentlemen clubs that are in the Philadelphia

24   metropolitan area.

25             They decide when they want to, what week, for what

1    period of time, what time of day, how much they're going to

2    pay in rental time, how late they want to stay.  They can

3    leave at any point in time that they want to leave.  Now,

4    there are times that there are "fines" which the testimony is

5    they're not enforceable.

6           3001 Castor will say if you want to leave early we

7    want you to pay $100.  They can't enforce that.  They don't

8    have very much success enforcing it.  It's designed to try and

9    keep the dancers there for a longer period of time because the

10   more dancers you have present, the theory is the more patrons

11   you get.

12          The club is operated at times when there are no

13   dancers there.  The club makes its money based upon alcohol

14   sales and food sales.  It actually has very good cuisine.

15          The women can make up to on average based upon --

16   based upon the statistics for 3001 Castor and the time period

17   at issue here in this litigation, they could make up to $1,600

18   in a given night, given the number of -- for a six-hour shift

19   on average they only spend 40 minutes on -- with stage time,

20   leaving them five hours and 20 minutes to socialize with

21   patrons.

22          And if they utilize that time period and perform

23   private dances, then in a given five hour and 20 minute period

24   they can make $1,600 --

25          THE COURT:  Okay, thank --

1          MR. INNELLI:  -- so they have all of -- they have

2   all of that opportunity based upon their skill, their ability

3   to make their business decisions taking into account what they

4   may have to pay for rental rates, what they have to pay for

5   the -- the time in the using the private room and whatever

6   else -- other costs that they may incur.

7          THE COURT:  All right, thank you.

8          MR. INNELLI:  Thank you.

9          THE COURT:  Would you like to be heard?

10         MR. WELLS:  Yes, Your Honor.  First and foremost,

11  defendant's argument with respect to the $1,600 is predicated

12  on the Lenahan affidavit, and before Your Honor is pending our

13  motion to strike that affidavit.

14         THE COURT:  Oh, okay.

15         MR. WELLS:  And we -- and but I'll put that aside.

16         THE COURT:  That's still a matter of fact.  Okay.

17         MR. WELLS:  Right.  But assume it's true.  Assume

18  Your Honor wants to look at it.  Big deal.  All it means is

19  that if they have the ability to hustle, they can -- they

20  could potentially make a lot of money.  There is evidence in

21  the record that there are plenty of times where dancers made

22  zero dollars.

23         And, there are plenty of Courts who have looked at

24  exotic dancer cases across the country and said the ability

25  for an individual to make money by hustling is irrelevant.

1    It's not an appropriate factor to look at.  It's akin to a

2    waiter who waits on a lot of tables and tries to turn over his

3    tables quickly to get more customers in so he can earn more in

4    tips.

5              That doesn't mean that the waiter is no longer an

6    employee of the restaurant and therefore not subject to the

7    protections of the FLSA.  All it means is that he's a hard

8    worker.  And ultimately while defense counsel wants to look at

9    DialAmerica, I suggest and urge the Court to look at that

10   because in DialAmerica there's two groups of individuals.

11             There were the distributors that defense counsel

12   quotes where the Court says they were not employees, and then

13   there were the home researchers where the Court said they were

14   employees even though they worked from home, they got to

15   choose their own hours that they wanted to work and got to

16   pick their own days they wanted to work and could make as

17   little or as much as they wanted to based on how hard they

18   worked.

19             And there the Third Circuit said you were in fact an

20   employee.  Why?  Because you're an integral part of the

21   company's business.  The distribution folks, which defense

22   counsel keeps quoting, were not integral to the business and

23   therefore the Third Circuit said based on that as well as some

24   other factors including your ability to set your own rates and

25   the like, you're not an employee.

1          We don't have that here.  What we have here is a

2    group of dancers who work at the Penthouse Club, who cannot --

3    who cannot negotiate their own rates for lap dancers,

4    defendant set those; cannot negotiate how long a lap dance

5    lasts, defendant sets that; cannot negotiate whether or not

6    they want to stay on stage or stay off stage, defendants say

7    you're going to pay us if you choose not to be on stage, and

8    they set a whole series of fines and penalties.

9          Now, defendants may say they're just suggestions,

10   but again, that's irrelevant.  Other Courts, and as set forth

11   in our brief who have looked at that have said the fact that

12   you're creating these suggestions and guidelines effectively

13   imposes upon the individual a desire to comply, and

14   accordingly, you're exerting control and that's what we have

15   here.

16         And if you look at the six-factor test under

17   DialAmerica, we have each and every one of those and

18   therefore, they're an employee, not an independent contractor.

19         THE COURT:  Okay, I'll rule.  Thank you.  Let's get

20   the second issue, which I have as -- summary judgment is the

21   first, then motion to certify, which is first the FLSA, you

22   asking for conditional certification, and then Rule 23.

23         So why don't you start on at the FLSA.  I don't

24   think I need much time on that, but I do need a lot of time on

25   Rule 23, so why don't you tell me about your position under

1   the Fair Labor Standards Act.

2           MR. LYNCH:  We aren't -- you know, I actually had

3   anticipated just suggesting to the Court that I would address

4   only Rule 23 because I think once we meet that, we'll easily

5   meet the modest standard at the first stage of the FLSA

6   notice, but I'll take them the way the Court suggests.

7           THE COURT:  Okay, do you want -- or I think that

8   that's not -- I don't -- I'm not going to really -- if I

9   decide that you're in court, in other words, if I decide that

10  they are employee -- that they are employees, I don't think

11  there's much issue about the conditional certification under

12  the Fair Labor Standards Act.  They have -- it's a very loose,

13  loose criteria and I don't think that's a problem.

14          But I think you may have a significant problem in a

15  Class 23 certification.  First of all, why do you need it?

16          MR. LYNCH:  First why do we need it, Your Honor?

17          THE COURT:  Yes.

18          MR. LYNCH:  We need it because the FLSA is only an

19  opt-in mechanism.  It only captures those dancers -- and

20  there's 300 of them, Your Honor, that are out there -- and for

21  the FLSA, they're just punitive notice recipients.  For Rule

22  23, obviously they're class members.

23          But under the 216(b) of the Fair Labor Standards

24  Act, the only people that would be included for purposes for

25  litigating the Fair Labor Standards Act claim would be those

1   people -- those dancers that come forward affirmatively --

2                THE COURT:  Well, I know that.

3                MR. LYNCH:  -- and file a consent to sue.

4                THE COURT:  It's an opt-in class.

5                MR. LYNCH:  So it's an opt-in class so what you need

6   for the State law claims in this case, we're asking for a Rule

7   23 certification, and aside from that being the right

8   procedural mechanism for those State law claims.

9                THE COURT:  So you -- first of all, you are asking

10  me on a Rule 23 on a State law claim -- it is definitely a

11  State law claim, is it not?

12               MR. LYNCH:  Yes.

13               THE COURT:  Okay.

14               MR. LYNCH:  There's two of them.

15               THE COURT:  And you are asking me to certify in this

16  Court -- first of all, how do you get in here?  Isn't it --

17  don't you need a party on each side?  Don't you -- I mean,

18  diversity, at least two parties must be diverse.  Where are

19  they diverse here?

20               MR. LYNCH:  Your Honor, we have supplemental

21  jurisdiction as well because we're already --

22               THE COURT:  Well, I know.  I'm not talking about

23  that.

24               MR. LYNCH:  Okay.

25               THE COURT:  Let's start with -- let's start with the

1  CAFA.  Tell me -- because you argue CAFA as I recall --

2              MR. LYNCH:  I don't -- I don't believe that our

3  complaint in this case has the State law claims coming into

4  Court under CAFA.  If we do, that might be mistaken because I

5  don't think we have fundamental diversity, unless we can

6  establish that we have one of the dancers of the 300 as being

7  outside of Pennsylvania --

8              THE COURT:  Okay.  All right.

9              MR. LYNCH:  -- but I think we have -- I think we

10  argued supplemental jurisdiction in this case.

11             THE COURT:  All right, well if you're giving up any

12  rights to argue it, to argue CAFA, then we certainly don't

13  have to go for CAFA, and I assume from your argument here that

14  you're not giving me a CAFA argument, is that correct?

15             MR. LYNCH:  I want to -- I want to say yes, Your

16  Honor, but I'm just checking very quickly.  I'd be -- the

17  home-state exception would apply in this case, even if we had

18  one or two of the 300 dancers from outside of Pennsylvania.

19             THE COURT:  But you don't.  I mean, the named

20  plaintiff is -- the named plaintiff is from Pennsylvania and

21  the named defendant is from Pennsylvania.

22             MR. LYNCH:  Yes.

23             THE COURT:  So we have nothing on the record at this

24  time that you have -- that you have diversity -- the necessary

25  diversity in CAFA -- under CAFA.

1          MR. LYNCH:  Yes.  And, Your Honor, just to make sure

2     the record's clear, we do have an allegation in the complaint

3     under CAFA and it is based upon an allegation that some

4     members of the 300 punitive class would be --

5          THE COURT:  Yes, but you don't have -- they're not

6     in the case now.

7          MR. LYNCH:  We don't have any record in evidence of

8     that, Your Honor, we just have the allegation in the

9     complaint.

10         THE COURT:  Well, all right.  Okay, well then that

11    may be or may not be enough.

12         MR. LYNCH:  Right.

13         THE COURT:  Why don't you argue to me supplemental

14    jurisdiction.

15         MR. LYNCH:  Right, that would be our other basis for

16    being in court.

17         THE COURT:  All right.  And what's -- and well, that

18    gives me a lot of discretion, doesn't it, whether to keep it

19    or not to keep it?

20         MR. LYNCH:  It does, Your Honor, and if the Court is

21    suggesting that it's going to exercise that discretion in the

22    context of the Rule 23 opt-out mechanism versus the 216(b)

23    opt-in mechanism, I would suggest that the Third Circuit has

24    addressed those issues, first in De Asencio in a negative way,

25    but then ultimately in the Rite Aid case in a more lenient

1   fashion and suggesting that there's no inherent conflict

2   between 216(b) of the FLSA and a Rule 23.

3            THE COURT:  Oh, I'm not suggesting that.

4            MR. LYNCH:  Okay.

5            THE COURT:  I'm simply suggesting that this is a

6   State Court issue and frankly between us, you also might even

7   be doing better in a State Court as far as getting

8   certification is concerned because we certainly have enough

9   roadblocks in the Federal system now on certification that I

10  don't see why you would object to my -- I mean, I'm not -- may

11  not be giving you a choice, but I don't see why you would be

12  objecting to my dismissing it and letting you re-file in State

13  Court.

14           MR. LYNCH:  I would argue, Your Honor, that the

15  sound discretion of this Court weighs in favor of keeping the

16  claims in front of it just for efficiency purposes, if nothing

17  else.  I mean, the claims -- there was such a -- there an

18  analog in Pennsylvania to FLSA, and that's the Minimum Wage

19  Act.

20           The analysis that's going to be done in this context

21  of whether these -- these women and these dancers are

22  independent contractors or not is going to be essentially the

23  same I believe.  Now, there is a second component to our State

24  law claims and that has to do with the Pennsylvania Wage

25  Payment and Collection Law, and that is unique and a little

1    bit different than the FLSA claim.

2            THE COURT:  Very different.

3            MR. LYNCH:  But it's not -- I don't think it's so

4    substantially different, at least as it relates to the facts

5    of this case and the underlying claim in this case or the

6    underlying issue in this case which is the one that's

7    certifiable, and that is are these dancers independent

8    contractors or employees.

9            And I would think that the discretion of this Court

10   would weigh in favor of keeping the claims together and

11   exercising supplemental jurisdiction over them.

12           THE COURT:  Mr. Lynch, what should I -- what are the

13   factors that I should consider in deciding in whether or not

14   to keep it, keep supplemental jurisdiction or whether or not I

15   should exercise my discretion?

16           There's one -- there's one Third Circuit case and

17   the name eludes me at the moment, but there's on Third Circuit

18   case that I read that said -- actually decided that a Judge

19   had abused their discretion by keeping it.

20           MR. INNELLI:  Yes.  That --

21           THE COURT:  I mean, what -- what factors make this

22   different and why should -- I mean, this was a -- they

23   actually -- they didn't give the District Court any rights to

24   make that decision.

25           MR. LYNCH:  And I believe that was the De Asencio

 1    vs. Tyson Foods case, Your Honor --

 2             THE COURT:  Yes, that's right.

 3             MR. LYNCH:  -- and I think that the reason that the

 4    Third Circuit said that the District Court had abused its

 5    discretion in keeping the case, if I have the procedural

 6    history of that correct, is that it had to do with this

 7    conflict that I was talking about between Rule 23 and the opt-

 8    in mechanism of 216(b), and I think that the Third Circuit has

 9    since revisited that issue in the context --

10             THE COURT:  Revisited.

11             MR. LYNCH:  -- revisited that issue in the context

12    of CAFA as well as I think maybe supplemental jurisdiction as

13    well.  But the issue of whether or not there is a significant

14    tension or any tension at all between 216(b) and Rule 23, and

15    actually the De Asencio vs. Tyson Foods case actually involved

16    exactly these three statutes.

17             THE COURT:  That's right.

18             MR. LYNCH:  It involved the Fair Labor Standards Act

19    and these two Pennsylvania statutes.

20             THE COURT:  That's correct.  And but they did decide

21    for the Judge -- I mean, there was no question that the Judge

22    could have decided --

23             MR. LYNCH:  Yes.

24             THE COURT:  -- that they're going to -- that they're

25    going to dismiss the supplemental cases.  I want to know what

1    you decide when you make -- when a Judge should make -- makes

2    that determination, what factors should a Judge consider.

3              MR. LYNCH:  Right.  And what I'm suggesting to the

4    Court is that since that decision came down, the Third Circuit

5    has revisited the issue on the one factor that I think the

6    Third Circuit was talking about that should have been analyzed

7    by the District Court in exercising its discretion.

8              THE COURT:  And what case was that?

9              MR. LYNCH:  And that was the <u>Rite Aid</u> case.  I think

10   it was <u>Knepper</u>.  I can't pronounce it, the plaintiff's name in

11   that case.  I can give you the cite to it and it's --

12             THE COURT:  No, that's okay.

13             MR. LYNCH:  But there's a case that happened -- came

14   down about a year or two ago --

15             THE COURT:  And you've cited it.

16             MR. LYNCH:  -- in the Third -- Third Circuit, yes.

17             THE COURT:  And you cite it in your brief?

18             MR. LYNCH:  I don't know if we cite that issue in

19   the brief or we've addressed the issue in the brief, but we

20   can certainly supplement the brief to address this issue of

21   the tension between Rule 23 and 216(b).

22             THE COURT:  Okay.

23             MR. LYNCH:  I'll check the brief to see --

24             THE COURT:  If I believe --

25             MR. LYNCH:  -- if we've cited it.

1          THE COURT:  If I believe that that's the issue here,

2     in other words, if I'm not ready to dismiss it or keep it

3     under other circumstances --

4          MR. LYNCH:  Yes.

5          THE COURT:  -- I will contact you and ask you for

6     it.

7          MR. LYNCH:  Okay.

8          THE COURT:  Or you can write me a letter and tell me

9     what it is.

10          MR. LYNCH:  Sure, Your Honor.  It wouldn't be very

11     difficult to even find that cite even as we sit here.

12          THE COURT:  You can put it on -- if you write me a

13     letter, you put it on ECF.

14          MR. LYNCH:  Okay.

15          THE COURT:  It's called a brief and you put it in

16     one letter and you can write a letter, I don't care.  I'm not

17     big on formalities that way.

18          MR. LYNCH:  Well thank you, Your Honor.

19          THE COURT:  But call it a brief, call it a brief and

20     write a page --

21          MR. LYNCH:  Yeah.

22          THE COURT:  -- half a page, quarter of a page.

23          MR. LYNCH:  That's fine, Your Honor.  The long and

24     short of it though is that --

25          THE COURT:  Okay.

1          MR. LYNCH:  -- Third Circuit decision from a few

2   years ago in the Rite Aid case --

3          THE COURT:  Okay, thank you.

4          MR. LYNCH:  -- put an end to this issue with De

5   Asencio vs. Tyson Foods.

6          THE COURT:  All right, thank you.

7          Okay, would you like to be heard on Rule 23?

8          MR. INNELLI:  Not on any of the issues that the

9   Court is -- raised on, Your Honor.

10          THE COURT:  You don't, you --

11          MR. INNELLI:  Well, as to whether you should

12   maintain jurisdiction over it --

13          THE COURT:  Yes.

14          MR. INNELLI:  -- there's nothing I can add to what

15   the Court has already said.

16          THE COURT:  Okay.  And you -- and your position is

17   that I should not retain jurisdiction on that?

18          MR. INNELLI:  Well, I think we'd like to have

19   finality.

20          THE COURT:  So, well, do you want me to keep it or

21   don't you?  What's your position?

22          MR. INNELLI:  I'd like -- I'd like there to be a

23   finding on it in our favor on summary judgment --

24          THE COURT:  Yes, of course.

25          MR. INNELLI:  -- with --

1            THE COURT:  But assuming this --

2            MR. INNELLI:  -- with --

3            THE COURT:  -- argument is all -- assuming that

4    there's no -- that I have not granted you your motion on

5    summary judgment, of course.

6            MR. INNELLI:  Well, if Your Honor were to deny the

7    motion on summary judgment and were to retain jurisdiction, we

8    would -- for the reasons set forth in our oppositions to their

9    motion for class certification, ask that a class not be

10   certified, that --

11           THE COURT:  Neither class --

12           MR. INNELLI:  That's --

13           THE COURT:  -- you know, under the --

14           MR. INNELLI:  That's correct, Your Honor.

15           THE COURT:  -- Federal --

16           MR. INNELLI:  Yes.

17           THE COURT:  Would you like to argue that or you're

18   not --

19           MR. INNELLI:  Well, it goes to the evidentiary

20   record.  We took Ms. Verma's deposition and Ms. Verma has not

21   brought this case for any violation of any of the acts that

22   are listed in the complaint -- in the complaint.  In her

23   testimony she said that the reason she brought this lawsuit is

24   she felt that she was mistreated --

25           THE COURT:  Okay.  Well that could be.

1              MR. INNELLI:  -- and that's -- she can't be a class

2     representative if that's her basis.  She testified that she

3     has worked at other -- appeared at other clubs, six other

4     clubs over a seven-year period of time and that the practices

5     she described and were very similar from one club to the next,

6     she didn't bring any claim against them for any of -- any of

7     the violations of the Fair Labor Standards Act.  Her sole

8     reason for bringing this lawsuit and naming just 3001 Castor,

9     Inc. is that she felt that she was disrespected.

10             THE COURT:  Well, you do understand that that's not

11    relevant?

12             MR. INNELLI:  Well, it --

13             THE COURT:  I mean --

14             MR. INNELLI:  -- it doesn't --

15             THE COURT:  -- it doesn't matter what her motive

16    was.  I hate to tell you some of the motives that people

17    that --

18             MR. INNELLI:  Well, but that goes -- that goes to

19    whether her claims are typical, I mean, and they're not.

20             THE COURT:  Okay.

21             MR. INNELLI:  So she -- and she's not --

22             THE COURT:  Well, if nobody joins, then you can --

23    if they join -- if I certify the Fair Labor Standards Act

24    class, then we'll see whether anyone else joins.

25             MR. INNELLI:  If there's a -- right, if you do the

```
 1    conditional --

 2              THE COURT:  Exactly.

 3              MR. INNELLI:  Okay.

 4              THE COURT:  Okay.

 5              MR. INNELLI:  But we were talking about Rule 23 and

 6    she doesn't meet the standards --

 7              THE COURT:  Oh, okay.

 8              MR. INNELLI:  -- to be a class representative under

 9    Rule 23 --

10              THE COURT:  Okay.

11              MR. INNELLI:  -- is what we --

12              THE COURT:  All right.  I hear you.  Okay.

13              MR. INNELLI:  Thank you.

14              THE COURT:  And the last is a motion to strike the

15    affidavit of Ms. Joan Lenahan.

16              MR. LYNCH:  Your Honor, before Mr. Wells addresses

17    that, can I just note for the Court where that Third Circuit

18    decision I've been referring to appears in our briefing?

19              THE COURT:  Okay.

20              MR. LYNCH:  It's in our motion -- I'm sorry, our

21    memorandum of law in support of our motion for conditional

22    certification which is Document 22 on the docket.  On page 4

23    of that brief in footnote 4 is our -- is a footnote that

24    addresses this inherently incompatible analysis between the

25    opt-out and the opt-in mechanism --
```

1          THE COURT:  All right.

2          MR. LYNCH:  -- and the case is Knepper v. Rite Aid

3    Corporation, 675 F.3d 249 --

4          THE COURT:  Thank you.  I appreciate that.

5          MR. INNELLI:  -- it's a Third Circuit decision from

6    2012.

7          THE COURT:  Okay, would you like to -- would you

8    like to address the motion to strike the affidavit?

9          MR. WELLS:  Yes, Your Honor.

10          THE COURT:  Okay.  Mr. Wells.

11          MR. WELLS:  Yes, Your Honor.

12          THE COURT:  Okay.

13          MR. WELLS:  Your Honor, the affidavit of Joan

14    Lenahan we believe is inappropriate for a number of reasons.

15    First and foremost, we think the entire motion for summary

16    judgment is in contravention of the Court's scheduling order,

17    so it's premature.  More fundamentally, however, it doesn't

18    constitute --

19          THE COURT:  Spell that out.  What do you mean, it's

20    premature?

21          MR. WELLS:  Pursuant to the scheduling order that we

22    -- that this Court entered, we were going to file for

23    conditional certification and then class certification by a

24    date certain, which we did, and then after the Court ruled on

25    the motion for class certification, we would then submit a

1   revised scheduling order and in that revised scheduling order

2   we would set forth dates for plaintiffs to move for summary

3   judgment, as well as for defendants to move for summary

4   judgment.

5            THE COURT:  Okay.

6            MR. WELLS:  That scheduling order wasn't followed.

7   Defendants on their own filed this motion prior to Your Honor

8   ruling on any of the motions for certification, so we think

9   that the motion itself is premature.  More fundamentally --

10            THE COURT:  Well, I'm going to -- I'm going to stop

11   you a second.  Let me find out from the defense what he

12   believes that affidavit does and then I think you can more

13   intelligently address it.

14            MR. WELLS:  Certainly.

15            THE COURT:  Thank you, Mr. Lynch.  Okay, Mr.

16   Innelli, why -- what's this affidavit about?

17            MR. INNELLI:  Okay, we were served with a 30(b)(6)

18   motion -- 30(b)(6) notice.  We produced Ms. Joan Lenahan --

19            THE COURT:  What does she have to do -- what is she

20   in -- how is she related to your organization?

21            MR. INNELLI:  She does work for the president of the

22   company, she has spent some time at 3001 Castor, Inc. on

23   special assignments that he has given her.

24            THE COURT:  Is she -- but she's a corporate rep?

25            MR. INNELLI:  She was --

1          THE COURT:  She's part of the organization?

2          MR. INNELLI:  She's not part of the organization

3   currently --

4          THE COURT:  Well how --

5          MR. INNELLI:  -- but --

6          THE COURT:  Doesn't a 30(b) -- does a 30(b) witness

7   have to be a part of the organization?  I thought that it did.

8          MR. INNELLI:  No, it's someone who has knowledge of

9   the items that are set forth in the Rule 30(b)(6) notice.

10         THE COURT:  Okay.

11         MR. INNELLI:  And I believe in the Rule 30(b)(6)

12  notice there were 32 or 35 different items listed and she had

13  knowledge to address all of those.

14         THE COURT:  Okay.

15         MR. INNELLI:  She stated so under oath at her

16  deposition.  Her deposition lasted approximately seven hours.

17  Almost everything in that notice -- 30(b)(6) notice was

18  covered.  And two of the items, number -- paragraph 25 and

19  paragraph 29, deal with the very topic that's covered by the

20  affidavit -- how many people worked 40 or more hours; what

21  information exists to make a determination as to what the

22  hourly rate was.

23         So what we did was take the only contemporarily

24  maintained source of when a dancer appeared at 3001 Castor,

25  Inc. -- what day, what time, for how long, and copied all of

1    that and made it all available to the -- to the plaintiffs.

2           The information that's contained in approximately

3    13,000 pages addresses a whole host of issues that are at

4    issue in this case including but not limited to whether these

5    individuals -- the dancers, are independent contractors.

6           And so what Ms. Lenahan did in accordance with

7    Federal Rule of Evidence 1006 is she took the voluminous

8    information, she presented it in the form of charts, summaries

9    and calculations to provide a response to --

10          THE COURT:  Well, what do you think she proved?

11          MR. INNELLI:  Well, everything that -- what she did

12   was she set out facts, data, from -- from the records that we

13   had and provided a whole -- whole list of things which the

14   data reveals.

15          THE COURT:  And what are they?

16          MR. INNELLI:  Well, how often people worked; whether

17   anyone worked for 40 hours a week; how frequently they worked

18   on average --

19          THE COURT:  Well, do you believe --

20          MR. INNELLI:  -- how frequently --

21          THE COURT:  -- that under the Fair Labor Standards

22   Act in order to comply with the Fair Labor Standards Act you

23   have to work for a 40-hour week?

24          MR. INNELLI:  No, but that's not the -- that's not

25   the only claim that they had, they had one for 40 hours --

1          THE COURT:  Okay.

2          MR. INNELLI:  -- for working over 40 hours.

3          THE COURT:  Well, that may be but you're using this

4    affidavit -- whether I decide to accept it or not, you're

5    using this affidavit to show what?  To show that they're --

6    that she's not -- that she is not an employee, isn't that

7    correct?

8          MR. INNELLI:  To show that all of the dancers are

9    not employees --

10         THE COURT:  All right.

11         MR. INNELLI:  -- that they're --

12         THE COURT:  Well --

13         MR. INNELLI:  -- independent contractors.

14         THE COURT:  -- she's not an employee.  And tell me

15   what she -- what you believe in her affidavit points to the

16   fact that she's not an employee.  What is it about the

17   affidavit that tells me that that I should conclude from that?

18         MR. INNELLI:  Okay.  I'd have to just take the

19   affidavit itself, Your Honor, and go through it.

20         THE COURT:  No, no, no, tell me what you think --

21   you know, you're presenting it to me, tell me what you think

22   that affidavit shows --

23         MR. INNELLI:  Okay.

24         THE COURT:  -- should show me.

25         MR. INNELLI:  What the affidavit shows is that very

1    much what I spoke of in terms of -- in support of the motion

2    for summary judgment, that each of the dancers is free to come

3    and go as they -- they want; they make their own business

4    decisions as to when to come in and work; while they're, what

5    opportunities present themselves.

6            They're on -- they're on stage in the most generous

7    interpretation on behalf of plaintiffs, a total of 40 minutes

8    in a six-hour shift, giving them five hours and 20 minutes to

9    spend the time in pursuit of making money.

10           Not just working hard, but making money, that what

11   the -- the rate they receive -- what the rates that they

12   receive are generates the opportunity to make up to $1,600 in

13   a given shift.  The data --

14           THE COURT:  All the things you already mentioned.

15           MR. INNELLI:  All that I already mentioned --

16           THE COURT:  All right.

17           MR. INNELLI:  -- and all of the -- and what that

18   also shows if you -- if one were to take it, you see the great

19   diversity that exists in the pattern in which individual

20   dancers work -- what day of the week is chosen most often.

21   Thursdays are chosen to work by more of the dancers than any

22   other day.

23           The number of dancers who appear on Friday and

24   Saturday and Sunday make those the peak days.  Seasons --

25   there's seasonal adjustments and the seasonal adjustments are

1    not consistent from one year to another.  All --

2            THE COURT:  So what does that show me?

3            MR. INNELLI:  All of that is indicia that decisions

4    are being made by the individuals, not by the business --

5            THE COURT:  Okay.

6            MR. INNELLI:  -- it's not being done in conformity

7    with a business schedule.  The business is not out there

8    recruiting women to come in because we need X number of people

9    on the stage, Y number of minutes for each shift, you know,

10   Monday through Friday --

11           THE COURT:  Okay.

12           MR. INNELLI:  -- things of that nature.

13           THE COURT:  I understand that.  Okay.

14           Would you like to be heard on this on -- first of

15   all, if this goes to the issue of whether or not this comes

16   under the Fair Labor Standards Act, you apparently took a

17   seven-hour deposition of this -- of this person.  That

18   certainly is admissible for the purposes of this hearing, is

19   it not?

20           MR. WELLS:  Yes, Your Honor, and in our statement of

21   facts, we include portions of Ms. Lenahan's 30(b)(6) --

22           THE COURT:  Well --

23           MR. WELLS:  -- deposition.

24           THE COURT:  -- then why do you want it stricken?

25           MR. WELLS:  The affidavit itself, Your Honor, should

1  be stricken because at no -- for two reasons.  One, it's not

2  lay testimony with respect to what's in the affidavit because

3  Ms. Lenahan didn't observe this.

4      And as defense counsel just acknowledged, she's not

5  an employee and as she testified during out 30(b)(6)

6  testimony, she was only in the club for a period of two to

7  three weeks at one point in time several years ago.  So it's

8  not as though this is what she observed and she's testifying

9  as to her observations under 701.

10     THE COURT:  But what do you believe the basis of her

11  observations are?

12     MR. WELLS:  What -- therefore what her -- the

13  affidavit is predicated on are these house-mom books which

14  defense counsel referenced earlier that she used, summarized

15  and gleaned information from.

16     Now, I will tell you if you read Ms. Lenahan's

17  deposition what she testified at during her deposition was

18  that by reviewing this she made certain decisions and was able

19  to understand them.  However, we left it at that because we

20  want to take the depositions of those house moms to determine

21  whether or not her observations are in fact correct.

22     Instead, what this affidavit does is assumes that

23  all of her analysis is in fact correct and purports to put it

24  forward as expert testimony.  She was never -- she was never

25  designated as an expert.  At no point during her 30(b)(6)

1    deposition prior to or subsequent did defense counsel ever say

2    she's going to be our expert.

3           She was -- none of the information that was included

4    in the statistical analysis was ever produced to us until the

5    affidavit was filed and ultimately, we don't think that this

6    is in any way a harmless error.  It's expert testimony, it's

7    attempted to be expert testimony.

8           All of the information contained in it is trying to

9    meet the requirement of 702 and we say you can't do that, and

10   there's no harmless error exception here because we were

11   harmed.  Had we known, we would have challenged Ms. Lenahan at

12   her deposition as to this information.

13          THE COURT:  All right.  So you didn't have it before

14   her deposition?

15          MR. WELLS:  We didn't -- we didn't know that she was

16   going to be an expert prior to her deposition.

17          MR. INNELLI:  She's not an expert.  They want to

18   make her an expert to try and preclude it.  Her testimony was

19   very clear.  She was given all of the mom books which she

20   copied, and the mom books were sent to the -- to the

21   plaintiffs well in advance of her deposition, and they knew

22   that she was going to be deposed on that topic.  We designated

23   her as a 30(b)(6) witness.

24          What she said at her deposition was she was told by

25   a house mom and the manager that the notations in there --

1    when they have a day and they have a time, that means that the

2    time that the person arrived on the premises.  The next time

3    is the time when they would be out on the stage, and the last

4    time is when they left the premises.

5              THE COURT:  All right.  And what conclusion do you

6    want me to draw from that, assuming that I don't strike it?

7    But I haven't made up my mind on that.  Assuming that I don't

8    strike it, what conclusion do you want me to draw from the --

9    from the affidavit?  I'm still not quite clear on that.

10             MR. INNELLI:  Okay, but let me just take one -- take

11   one step further.  What she did was download all of that

12   information and then ran statistical analyses such as how many

13   women worked a 40-day week (sic).

14             She just fed all the data into a computer that she

15   has that has programs that can take all 400-and-some-odd women

16   over all 700-and-some-odd days and then present that

17   information in a myriad of charts and summaries so that I can

18   look at it and make an argument to the Court that this is an

19   independent contractor because of A, B, C and D.

20             THE COURT:  Well, I'm not sure at this stage --

21   okay, I understand the argument from both of you now and I

22   believe that this -- I will decide whether it is an expert or

23   not.  If it's an expert, she is not precluded at the time of

24   trial from testifying because you've now notified -- you have

25   now notified the plaintiff that she is -- of her -- of being a

1    witness.

2              She does have to give a summary.  If she is an

3    expert, she does have to give a summary of what her testimony

4    is going to be and it has to be -- a deposition has to be

5    taken on that --

6              MR. INNELLI:  Right.  And --

7              THE COURT:  -- on that basis.

8              MR. INNELLI:  Right.  I don't want to cut the Court

9    off but I --

10             THE COURT:  Yes, that's okay.

11             MR. INNELLI:  -- but I do want to say if she is

12   designated as an expert, then all that has to take place.

13   We've not designated her as an expert.

14             THE COURT:  I know, but I have to decide whether she

15   is or she isn't.

16             MR. INNELLI:  At this juncture.

17             THE COURT:  That's right.

18             MR. INNELLI:  Okay.

19             THE COURT:  Okay?

20             MR. INNELLI:  And if I may address one other thing,

21   Your Honor, that was raised as a basis for striking?

22             THE COURT:  Hm-hmm.

23             MR. INNELLI:  We filed a motion to dismiss initially

24   for failure to state a claim because the plaintiff is not an

25   employee, and at the request of the plaintiff's counsel we

```
 1   withdrew that --
 2              THE COURT:  Oh, of course.
 3              MR. INNELLI:  -- so as to take discovery and the
 4   understanding that I had was that that discovery would take
 5   place and at that point in time we could file a motion for
 6   summary judgment --
 7              THE COURT:  Well, sure.  There's no question.
 8              MR. INNELLI:  -- in lieu of the motion to dismiss so
 9   as not to incur large and extensive legal expenses --
10              THE COURT:  I haven't -- I'm not going to dismiss it
11   based upon that.  You certainly have a right to move for
12   summary judgment based upon this.  Whether I'm going to
13   include the testimony of Ms. Lenahan, that's another issue.
14              MR. INNELLI:  Okay.
15              THE COURT:  You certainly can include the deposition
16   they took of her, they asked for it.
17              MR. INNELLI:  Right.
18              THE COURT:  Okay.  Thank you very much.
19              MR. INNELLI:  Thank you, Your Honor.
20              THE COURT:  I will rule --
21              MR. WELLS:  Thank you, Your Honor.
22              MR. LYNCH:  Thank you, Your Honor.
23              THE COURT:  -- in the next couple of weeks, okay?
24              MR. WELLS:  Thank you.
25              THE COURT:  Thank you very much.
```

1          (Matter concluded, 2:47 p.m.)

2                         * * *

3

4

5                  **C E R T I F I C A T I O N**

6          I, Diane Gallagher, court approved

7    transcribers, certify that the foregoing is a correct

8    transcript from the official electronic sound recording of the

9    proceedings in the above-entitled matter.

10

11

12    _____          _____

13    DIANE GALLAGHER                    DATE

14    DIANA DOMAN TRANSCRIBING, LLC

15

16

17

18

19

20

21

22